INTERNATIONAL FIDELITY INSURANCE COMPANY *vs.*
RICHARD E. WILSON, SR., & another[1]
(and a companion case[2]).

Middlesex.   September 14, 1982. — January 10, 1983.

Present: WILKINS, LIACOS, ABRAMS, NOLAN, & LYNCH, JJ.

*Practice, Civil,* Directed verdict, Self-representation, Special verdict, Judgment. *Fraud. Consumer Protection Act,* Damages, Businessman's claim. *Damages,* Consumer protection case. *Statute,* Construction.

A defendant in a contract action, appearing pro se after the trial judge ordered his counsel to withdraw from representing multiple defendants, was barred on appeal from challenging the sufficiency of the evidence by his failure to move for a directed verdict. [846-847]

In an action by the issuer of a bond to secure the performance of a contract to repair a bridge evidence warranted a finding that a defendant had engaged in a concerted plan of deception to induce the plaintiff to issue the bond and that the plaintiff suffered damage as a result of this deception when there was a default on the construction contract. [847-849]

An insurance company which had issued a construction contract performance bond and had entered into an indemnity agreement with the contractor and his wife to secure the bond, and which had been required, upon the contractor's default, to complete the construction contract at a cost in excess of the amount of the bond was not precluded by its recovery against the contractor and his wife on the indemnity agreement from recovering actual and multiple damages under the Consumer Protection Act against certain individuals whose deception had induced the insurance company to issue the bond. [849-851]

A defendant in a civil action, who failed to make an objection to omission of an issue from special questions before the jury retired, could not raise the issue on appeal. [851]

---

[1] Sarah J. Wilson.

[2] International Fidelity Insurance Company *vs.* Richard E. Wilson, Jr., Richard E. Wilson Corp., city of Boston, and Patrick H. Pignato. The defendants Richard E. Wilson Corp. and the city of Boston are not before this court.

Where there was no indication in the answers to special questions returned by the jury in a civil action that the jury had found that a defendant was merely an employee of a contractor, and where the defendant and the plaintiff had been acting in a business context, the defendant could be held liable under G. L. c. 93A, § 11, for certain deceptive acts. [851-852]

A plaintiff seeking to recover against a number of defendants under the multiple damages provisions of G. L. c. 93A, § 11, is not restricted to a single award of multiple damages, but may recover from each defendant individually. [853-859]

Where certain judgments entered in two civil actions did not "adjudicate all the rights and liabilities of all the parties" the judge was free to enter subsequent judgments making revisions and finally disposing of all claims. [859-860]

Where a defendant in a civil action took an active part in pretrial proceedings before her counsel withdrew, where it appeared that she had notice of the progress of the case through her husband's participation as a defendant, and where she filed timely notices of appeal from judgments entered against her, the final judgment against her was valid. [860-863]

CIVIL ACTIONS commenced in the Superior Court Department on April 8, 1977, and December 18, 1978.

The cases were tried before *Steadman, J.*

The Supreme Judicial Court granted a request for direct appellate review.

*Marvin H. Margolies* for Richard E. Wilson & others.

*Leonard E. Pass & William M. Appel* for Patrick H. Pignato.

*Joseph D. Steinfield* for the plaintiff.

LIACOS, J.  These cases, consolidated at trial, arise out of the reconstruction of Powder Point Bridge in the town of Duxbury.  The plaintiff International Fidelity Insurance Company (IFIC) issued a payment and performance bond to Wilson Iron Works, a sole proprietorship owned by the defendant Richard E. Wilson, Sr., to secure the performance of a contract with the town of Duxbury to repair the bridge.  Wilson Iron Works defaulted on the contract, and the town called on IFIC to meet its obligations under the bond.  IFIC did so and brought these actions to recover damages.

IFIC contended that it issued the bond in reliance on the apparent ability and willingness of Wilson Iron Works to perform the repairs and suffered damages when Wilson Iron Works proved unable and unwilling to do so. It advanced three theories for recovery. First, it alleged that the defendants Wilson, Sr., and his wife Sarah Wilson were liable on an indemnity agreement issued to secure the bond. Second, it alleged that the defendants had made fraudulent misrepresentations and were liable under the common law of fraud. Third, it alleged that the defendants Wilson, Sr., Wilson, Jr., and Pignato committed wilful and knowing violations of G. L. c. 93A, §§ 2 & 11, and were liable for multiple damages and attorneys' fees.

The cases went to trial before a jury on March 20, 1981. The plaintiff called a number of witnesses, introduced exhibits, and read into the record depositions taken of the defendants. None of the defendants testified at the trial or called any witnesses on their behalf. The jury were informed that Wilson, Jr., and Pignato each claimed a privilege under the Fifth and Fourteenth Amendments to the Constitution of the United States, and under art. 12 of the Massachusetts Declaration of Rights, and refused to answer numerous questions while being deposed. Wilson, Sr., and Mrs. Wilson were not represented by counsel during the trial.

The judge submitted written questions to the jury who made written findings (special verdicts) under Mass. R. Civ. P. 49 (a), 365 Mass. 812 (1974). The jury answered as follows. First, there was a valid contract of indemnity between IFIC and the defendants Wilson, Sr., and Mrs. Wilson. Second, Wilson, Sr., and Mrs. Wilson either signed or ratified the indemnity agreement with IFIC. Third, IFIC expended $208,470, the penal sum of the bond, to satisfy its liabilities under the bond. Fourth, Wilson, Sr., signed the contract for the repair of the bridge. Fifth, he failed to perform his contract for repair. Sixth, IFIC suffered damages as a result of fraudulent misrepresentations to it by Wilson, Sr., Wilson, Jr., and Pignato. Seventh and eighth, IFIC

suffered damages as a result of the use by Wilson, Sr., Wilson, Jr., and Pignato of unfair and deceptive practices. Ninth, IFIC suffered damages of $19,728 as a consequence of either the defendants' unfair and deceptive practices or their fraudulent misrepresentations.

Based on these answers, a series of judgments was entered as follows: A judgment for the plaintiff against Wilson, Sr., and Mrs. Wilson on the indemnity count for $208,470, plus interest from April 4, 1977; a judgment against Wilson, Sr., Wilson, Jr., and Pignato, jointly and severally, for compensatory damages of $19,728 on the fraud count and the G. L. c. 93A count, and for attorneys' fees of $19,990 under G. L. c. 93A, § 11. The judge also determined, based on the jury's answers, that the defendants had engaged, intentionally, in unfair and deceptive acts, that Wilson, Sr., Wilson, Jr., and Pignato had committed wilful and knowing violations of G. L. c. 93A, § 2, and were liable for multiple damages under G. L. c. 93A, § 11. A judgment for double damages against Wilson, Sr., and treble damages against Wilson, Jr., and Pignato was entered, assessing noncompensatory damages of $19,728 against Wilson, Sr., and $39,456 each against Wilson, Jr., and Pignato. The judgments provided that each defendant was independently liable for these awards. The plaintiff's damage awards under these judgments totalled $346,828, consisting of $208,470 on the indemnity agreement, attorneys' fees of $19,990, compensatory damages under the common law of fraud and § 11 of $19,728, and multiple damages under § 11 of $98,640.[3]

The defendants appeal from the various judgments.[4] They challenge the validity of the entry of these judgments, including the computation of damages due the plaintiff. They also challenge various rulings and proceedings below, as well as the sufficiency of the evidence to support the special

---

[3] We shall explain the events leading to these judgments later in this opinion.

[4] The appeals are here on our allowance of IFIC's application for direct appellate review. Mass. R. A. P. 11 (f), 365 Mass. 854 (1974).

verdicts. We shall consider all issues that are properly be-
fore us and affirm the judgments.

There was evidence of the following facts. In March,
1976, the town of Duxbury received a bid from Wilson Iron
Works on a contract to repair Powder Point Bridge. The
bid was notarized by Pignato and falsely indicated that Wil-
son Iron Works was an experienced bridge contractor. Dur-
ing the months of April and May, Wilson, Jr., and Pignato
made several trips to Duxbury and assured the town of Wil-
son Iron Works's ability to perform the contract and to fur-
nish a bond. The town determined that Wilson Iron Works
was the lowest qualified bidder. On May 10, 1976, the
town and Wilson Iron Works signed a contract for the re-
pair of Powder Point Bridge.

During this time, Wilson Iron Works sought to obtain a
payment and performance bond from IFIC to secure the
performance of the contract. Wilson, Jr., and Pignato re-
tained an accounting firm which prepared unaudited finan-
cial statements. Wilson, Jr., Wilson, Sr., and Pignato then
met with Norman Daniel, the Massachusetts broker agent of
IFIC. Daniel testified that at the meeting, Wilson, Sr.,
stated that he was an experienced bridge contractor, ready
and able to repair Powder Point Bridge. Daniel told Wil-
son, Sr., that he and his wife would be required to sign an
indemnity agreement and to provide financial statements.
Wilson, Sr., replied that he would do so, but indicated that
there might be a problem getting his wife's signature. Wil-
son, Jr., represented that he was an employee of Wilson
Iron Works and said that he would help persuade Mrs. Wil-
son to sign the agreement. Following the meeting, Wilson,
Jr., and Pignato forwarded the required financial state-
ments to Daniel, who undertook his own review of the Wil-
sons' credit standing. After completing this review, Daniel
recommended to IFIC that it issue the bond. An indemnity
agreement bearing the apparent signatures of Mrs. Wilson
and Richard Wilson, Sr., was signed and notarized by Pig-
nato, and IFIC issued the bond.

Work began on the bridge in June or July, 1976, under
the supervision of Wilson, Jr., with no evidence of assistance

from his father.  Requisitions bearing the name of Wilson, Sr., were submitted to the town, and the town issued periodic checks payable to Wilson Iron Works.  These checks were deposited in bank accounts opened by Wilson, Jr., in the name of Wilson Iron Works.  The bridge work proceeded haphazardly.  During December, the town notified IFIC that Wilson Iron Works had defaulted and called upon IFIC to complete the work and to pay any suppliers who had outstanding claims.

IFIC hired a new contractor who completed the work at a net cost to IFIC of $182,947.77.  The contractor testified that he had to do over much of the work done by Wilson because of its poor quality.  He also testified that Wilson, Jr., received multiple payments for materials.  IFIC also satisfied the claims of Wilson's suppliers in the amount of $44,250.[5]

1. *Sufficiency of the evidence.*  At the outset, we are confronted with challenges to the sufficiency of the evidence below to support the special verdicts.  Wilson, Sr., argues that IFIC failed to demonstrate that he signed either the indemnity agreement or the contract between the town and Wilson Iron Works, or that he either engaged in any unfair or deceptive practices or made any fraudulent misrepresentations which damaged IFIC.  Wilson, Jr., presents similar argument as to whether IFIC was damaged by any unfair or deceptive practice or fraudulent misrepresentation.  For different reasons, we decline to set aside the special verdicts as to either defendant.

a. *Wilson, Sr.*  It is an established rule that an "appellate court cannot review the sufficiency of the evidence in the absence of an effective motion for a directed verdict." *Martin* v. *Hall*, 369 Mass. 882, 884 (1976).  See Mass. R. Civ. P. 50 (a), 365 Mass. 814 (1974).  Our review of the record reveals that Wilson, Sr., failed to move for a directed verdict.  Consequently, he is barred from challenging the sufficiency

---

[5] The sum IFIC paid to the new contractor and to Wilson's suppliers was $227,197.77.  The jury apparently made an error, since they found that IFIC suffered damages in the amount of $228,198.

of the evidence here. We recognize that Wilson, Sr., appeared pro se after the trial judge ordered his original counsel to withdraw from representing multiple defendants. The judge, however, issued that order eight months before the case came to trial. Wilson, Sr., had ample opportunity to secure substitute counsel, but he chose instead to proceed without counsel.[6]

The right of self-representation is not "a license not to comply with relevant rules of procedural and substantive law." *Faretta* v. *California,* 422 U.S. 806, 834-835 n.46 (1975). A pro se litigant is bound by the same rules of procedure as litigants with counsel. *Martinez-McBean* v. *Government of V.I.,* 562 F.2d 908, 912-913 (3d Cir. 1977). *In re Brewster,* 115 N.H. 636, 638 (1975) (per curiam). *Commerce Bank* v. *Conrad,* 560 S.W.2d 388, 390 (Mo. App. 1977). We see no reason to make an exception here.[7]

b. *Wilson, Jr.* We now turn to the challenge raised by Wilson, Jr. At the close of evidence, he moved for a directed verdict. He also filed a motion after the trial for judgment notwithstanding the verdict, and for a new trial. Mass. R. Civ. P. 50 (b). He has therefore preserved his rights to challenge the sufficiency of the evidence below. *Tucker* v. *Badoian,* 376 Mass. 907, 916 (1978). See Mass. R. Civ. P. 50 (a).

We construe the evidence most favorably to IFIC, *Boyle* v. *Wenk,* 378 Mass. 592, 593 (1979), to determine "whether, 'anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff.'" *Poirier* v. *Plymouth,* 374 Mass. 206, 212 (1978), quoting *Raunela* v. *Hertz Corp.,* 361 Mass. 341, 343

---

[6] His original counsel purports, however, to argue Wilson, Sr.'s, appeal on this and other issues. The brief does not indicate how this issue as to Wilson, Sr., can be properly before us.

[7] We have concluded, however, in the course of our review of the evidence in the case, that Wilson, Sr.'s, claim of insufficient evidence is without merit.

(1972). We are mindful that the inferences must be based on "probabilities rather than possibilities" and not the result of "mere speculation and conjecture." *Alholm* v. *Wareham,* 371 Mass. 621, 627 (1976).

Wilson, Jr., begins his argument with the statement that the only unfair or deceptive act which he could have performed was the fraudulent use of the forged signatures of Wilson, Sr., and Mrs. Wilson. He contends that since the jury found those signatures to be "genuine," the jury could not properly find that he engaged in any unfair or deceptive practice which caused damage to IFIC. This argument wholly misconceives both the evidence presented below and the special verdicts returned by the jury.

It is clear that IFIC's case went far beyond the matter of the signatures. IFIC introduced sufficient evidence to support findings that Wilson, Jr., made numerous misrepresentations designed to further the deception that Wilson Iron Works, as an experienced bridge contractor, intended to bid on and perform the contract to repair Powder Point Bridge. The evidence also warranted conclusions by the jury that (1) Wilson Iron Works never did, and never intended to do, any work on the bridge,[8] (2) Wilson, Jr., falsely held himself as an employee of Wilson Iron Works, (3) Wilson, Jr., represented that Wilson Iron Works was an experienced bridge contractor,[9] and (4) Wilson, Jr., at all times intended to do the work himself. The jury could have found also that Wilson, Jr., damaged IFIC by failing to pay his suppliers with the funds he received from the town and by failing to coop-

---

[8] The work, done under the name of Wilson Iron Works, was not done by that enterprise (controlled by Wilson, Sr.), but was done by Wilson, Jr., under the guise of that name. See text, *supra* at 845-846.

[9] The jury could have found that Wilson, Jr., submitted the Wilson Iron Works bid, which stated that Wilson Iron Works had performed two bridge contracts for the Commonwealth. Wilson, Jr., forwarded the bid to Daniel to aid him in his underwriting review. Moreover, Wilson, Jr., sat silently by while his father represented to Daniel that Wilson Iron Works was an experienced bridge contractor. During his deposition, Wilson, Sr., denied ever doing any work either for the Commonwealth or on any bridge.

erate with the contractor hired by IFIC to complete the work. The crux of IFIC's case is not that Wilson, Jr., committed a single act of deception, but that he carried out a concerted plan.[10] The jury did not find, by their answers to the special questions, that Wilson, Sr., and Mrs. Wilson signed the indemnity agreement. Their answer to the particular question only indicated that they either signed or ratified the agreement. We conclude that the special verdict was supported by the evidence below.

2. *Sufficiency of evidence of damage.* Wilson, Jr., and Pignato argue that the answer finding Wilson, Sr., and Mrs. Wilson liable on the indemnity agreement cannot be reconciled with the answer finding that the acts of Wilson, Jr., and Pignato damaged IFIC. They reach this conclusion by assuming that IFIC must show that it suffered damage as a result of forged and improperly notarized signatures on the indemnity agreement. They also assume that the record demonstrates that IFIC relied solely on the authenticity of the Wilsons' signatures to ensure that it could sue on the indemnity agreement in the event of a default on the contract. They conclude that, since IFIC sued successfully on the agreement, it cannot show any damage.[11]

---

[10] We note that Wilson, Jr., made no effort to refute the evidence presented by IFIC. His refusal, during the taking of his deposition, to answer relevant questions posed by IFIC on the grounds of self-incrimination warranted the drawing of adverse inferences by the jury. *Labor Relations Comm'n* v. *Fall River Educators' Ass'n,* 382 Mass. 465, 471-472 (1981). *Kaye* v. *Newhall,* 356 Mass. 300, 305-306 (1969). The same can be said of his failure to call any witnesses. *Commonwealth* v. *United Food Corp.,* 374 Mass. 765, 771-772 (1978).

[11] The essential thrust of these arguments is not entirely clear. It is possible that these defendants are arguing that the special verdicts are inconsistent. We have considered such arguments under Mass. R. Civ. P. 49 (b), 365 Mass. 812 (1974). See *McCue* v. *Prudential Ins. Co.,* 371 Mass. 659, 663 (1976). The questions put to the jury in this case appear to have been put under Mass. R. Civ. P. 49 (a). These defendants cite neither Rule 49 (a) or (b), nor any other authority on this point. Since this issue was not adequately briefed or argued, we need not consider it. Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 919 (1975). *Wolfberg* v. *Hunter,* 385 Mass. 390, 392 n.3 (1982). We express no view as to whether we would apply to rule 49 (a) the rule set in rule 49 (b) that "[w]hen the an-

Their argument breaks down at several points. First, they appear to argue that a cause of action under G. L. c. 93A is restricted by the traditional limitations of the common law actions for fraud and deceit; the argument focuses on the adequacy of IFIC's proof of actual reliance. This focus is inappropriate. This court has rejected the proposition that a plaintiff must show proof of actual reliance on a misrepresentation under c. 93A, § 9. *Slaney* v. *Westwood Auto, Inc.*, 366 Mass. 688, 703 (1975). We see no reason to reach a different result under c. 93A, § 11.

What the plaintiff must show is a causal connection between the deception and the loss and that the loss was foreseeable as a result of the deception. *Kohl* v. *Silver Lake Motors, Inc.*, 369 Mass. 795, 800-801 (1976). Our review of the record reveals that the jury were warranted in finding that IFIC had met its burden. Without the signatures on the indemnity agreement, IFIC would not have issued the bond and would not have been required to complete the contract. Such proof is sufficient to establish a causal link between the defendants' acts and the loss to IFIC. *Strother* v. *Shain*, 322 Mass. 435, 437 (1948) (plaintiff may recover damages caused by false notarization). *Iselin-Jefferson Fin. Co.* v. *United Cal. Bank*, 16 Cal. 3d 886, 890-892 (1976) (plaintiff would not have entered into transaction which caused it damage but for the improper notarization of defendant).

---

swers are inconsistent with each other and one or more is likewise inconsistent with the general verdict, judgment shall not be entered, but the court shall return the jury for further consideration of its answers and verdict or shall order a new trial." Compare the treatment of rule 49 (b) in *McCue* v. *Prudential Ins. Co., supra,* with that of rule 49 (a) in *Morrison* v. *Frito-Lay, Inc.*, 546 F.2d 154 (5th Cir. 1977), and *Mercer* v. *Long Mfg. N. C., Inc.*, 671 F.2d 946, 947-948 (5th Cir. 1982). Cf. *Raytheon Mfg. Co.* v. *Indemnity Ins. Co.*, 333 Mass. 746, 749 (1956). We note that neither defendant filed a motion for correction of alleged inconsistencies prior to dismissal of the jury or requested a new trial. 9 C.A. Wright & A.R. Miller, Federal Practice and Procedure § 2510, at 517 (1971). We note also that the trial judge concluded the jury's answers to be consistent. We consider the issue, as phrased, to be one of sufficiency of evidence of damage.

Nor can it be argued that IFIC's recovery is limited to the penal sum of the performance bond. Where a surety company assumes the role of the principal and completes the contract, it is liable to pay sums in excess of the penal sum. *Caron* v. *Andrew,* 133 Cal. App. 2d 402, 410-412 (1955). *Suetter* v. *Cornwall,* 102 Or. 220, 231 (1921). Of course, IFIC was under a duty to act reasonably and to mitigate its damages. But the defendants had an opportunity to try the issue below, and the jury found against them. Their finding is supported by the evidence.[12]

3. *Applicability of § 11.* Wilson, Jr., and Pignato also contend that they are not such persons engaged in the conduct of trade or commerce so as to be subject to the provisions of G. L. c. 93A, § 11.[13] See *Lantner* v. *Carson,* 374 Mass. 606 (1978). Since Pignato did not raise the issue below, we decline to consider the issue as it relates to him. *Royal Indem. Co.* v. *Blakely,* 372 Mass. 86, 88 (1977).

Wilson, Jr., raised the issue for the first time in his motion for judgment notwithstanding the verdict. He presents two arguments. First, he argues that the jury made no findings

---

[12] Since the jury found Wilson, Jr., and Pignato liable under § 11, we need not determine whether IFIC sustained its burden of proof on the fraud count. *Danca* v. *Taunton Sav. Bank,* 385 Mass. 1, 8 (1982). We note, however, that the record demonstrates that IFIC relied in part on the misrepresentation that Wilson Iron Works was an experienced bridge contractor ready to perform. Thus, the defendants' argument, that IFIC suffered no damage since it received what it would have received had the signatures on the indemnity agreement been valid, again misconceives the nature of the plaintiff's case and the evidence before the jury.

[13] General Laws c. 93A, § 11, inserted by St. 1972, c. 614, § 2, provides in part: "Any person who engages in the conduct of any trade or commerce and who suffers any loss of money or property, real or personal, as a result of the use or employment by another person who engages in any trade or commerce of an unfair method of competition or an unfair or deceptive act or practice declared unlawful by section two or by any rule or regulation issued under paragraph (c) of section two may, as hereinafter provided, bring an action in the superior court, or in the housing court as provided in section three of chapter one hundred and eighty-five C, whether by way of original complaint, counterclaim, cross-claim or third-party action for damages and such equitable relief, including an injunction, as the court deems to be necessary and proper."

as to whether Wilson, Jr., was engaged in a business. To preserve his rights under Mass. R. Civ. P. 49 (a),[14] a party must lodge an objection to the omission of any issue in the special questions before the jury retires. *Cote* v. *Estate of Butler,* 518 F.2d 157, 160 (2d Cir. 1975). Despite several opportunities, Wilson, Jr., did not lodge such objection. Where the issue is omitted, the rule provides that "the court may make a finding; or, if it fails to do so, it shall be deemed to have made a finding in accord with the judgment on the special verdict." Mass. R. Civ. P. 49 (a), 365 Mass. 812 (1974). Thus, while the trial judge did not make a specific finding, he is deemed to have done so when he entered the judgment. Wilson, Jr., has no cause to complain that a finding was not made.

Second, Wilson, Jr., argues that he cannot be held liable under c. 93A, § 11, since the jury found that he was an employee of Wilson Iron Works. The claim is without merit. There is no indication in the answers to the special questions that the jury found that Wilson, Jr., was merely an employee.[15] Section 11 only requires that the parties act "in a business context." *Lantner* v. *Carson, supra* at 611. The record refutes any suggestion that the parties did not act in such a context. Compare *Begelfer* v. *Najarian,* 381 Mass. 177, 190-191 (1980), with *Nader* v. *Citron,* 372 Mass. 96, 101-103 (1977).

---

[14] Rule 49 (a) of the Massachusetts Rules of Civil Procedure, 365 Mass. 812 (1974), provides in part: "The court may require a jury to return only a special verdict in the form of a special written finding upon each issue of fact. . . . The court shall give to the jury such explanation and instruction concerning the matter thus submitted as may be necessary to enable the jury to make its findings upon each issue. If in so doing the court omits any issue of fact raised by the pleadings or by the evidence, each party waives his right to a trial by jury of the issue so omitted unless before the jury retires he demands its submission to the jury. As to an issue omitted without such demand the court may make a finding; or, if it fails to do so, it shall be deemed to have made a finding in accord with the judgment on the special verdict."

[15] This appeal does not present the issue whether acts of an employer or employee may give rise to a claim under c. 93A between such parties. That issue is before the court in Robert J. Manning *vs.* Mortimer B. Zuckerman (S.J.C. Doc. No. 2893, argued Sept. 16, 1982).

4. *Multiple damage awards under c. 93A.* Wilson, Sr., Wilson, Jr., and Pignato also challenge the trial judge's method of awarding multiple damages under c. 93A, § 11. They argue that IFIC is limited to a single award of multiple damages for which they are jointly and severally liable. We disagree.

a. *Background.* The Legislature first created a private remedy under c. 93A in 1969.[16]  Chapter 93A ties liability for multiple damages to the degree of the defendant's culpability by creating two classes of defendants.  The first class is those defendants who have committed relatively innocent violations of the statute's substantive provisions.  These defendants are not liable for multiple damages.  *Linthicum* v. *Archambault,* 379 Mass. 381, 388 (1979).  The second class is those defendants who have committed "willful or knowing" violations.  § 11, *supra.*  Based on the egregiousness of each defendant's conduct, the trial judge may assess between double and treble damages.  When the Legislature extended the protection of c. 93A to the business context, it incorporated this scheme concerning multiple damages into § 11.  St. 1972, c. 614, § 2.

b. *Legislative intent.* The question presented by this case has not been raised previously under either § 9 or § 11. We begin with the canon of statutory construction that the primary source of insight into the intent of the Legislature is the language of the statute.  *Hoffman* v. *Howmedica, Inc.,* 373 Mass. 32, 37 (1977).  The language of § 11, however, does not yield an answer.  On one hand, the language focuses on the size of the injury and refers to the culpability of the defendant in an indirect manner.  This suggests that the statute be read as requiring joint and several liability once any one of the defendants commits a "willful or knowing violation."  On the other hand, joint and several liability would conflict with the clear intent of the statute to distin-

---

[16] The origin and nature of G. L. c. 93A, as originally enacted by St. 1967, c. 813, is set forth in *Slaney* v. *Westwood Auto, Inc.,* 366 Mass. 688 (1975).

guish among different degrees of culpability. Language alone does not tell us which of these inferences to follow.

The language of the statute being inconclusive, we must look to extrinsic sources for assistance in determining the correct construction of the statute. *Barclay* v. *DeVeau*, 384 Mass. 676, 680 (1981). One important source is preexisting law, see *Condon* v. *Haitsma*, 325 Mass. 371, 373 (1950), since the Legislature must be presumed to be aware of the decisions of this court. In interpreting the language of § 9, we have looked to analogous statutory material and relevant case law to determine the intent of the Legislature. *Murphy* v. *Charlestown Sav. Bank*, 380 Mass. 738, 747-750 (1980).[17]

We find two distinct bodies of law which are analogous. The first body of law is that developed under the Clayton Antitrust Act (Act) which provides that "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue . . . and shall recover threefold the damages by him sustained." 15 U.S.C. § 15 (1976 & Supp. V 1981). Under the Act, the trial judge has no discretion to deny the plaintiff treble damages once a violation — even a merely negligent one — is proved. Liability under the Act is joint and several. *Texas Indus.* v. *Radcliff Materials, Inc.*, 451 U.S. 630, 646 (1981). Joint and several liability is consistent with the Act's rule that liability does not vary with the degree of the defendant's culpability. It is also needed to place a limit on liability for relatively innocent violations of the Act and to discourage strike suits.

---

[17] In *Murphy* v. *Charlestown Sav. Bank*, 380 Mass. 738 (1980), the plaintiffs argued that a mortgagor in a home loan mortgage is a "purchaser" of property within the meaning of the former c. 93A, § 9. While we found the argument to have "some intuitive appeal," *id.* at 743, our review of analogous statutory material and relevant case law forced us to reject it. *Id.* at 747. The statute construed in *Murphy* was G. L. c. 93A, § 9 (1). The language was changed by St. 1979, c. 406, § 1, to remove the limitations discussed in *Murphy*.

Some States have adopted statutes modeled on the Clayton Act.[18]  The Massachusetts Legislature considered, but rejected, such a proposal when it enacted § 9.  Senate Doc. No. 211 of 1969 provided that "[a]ny person who purchases goods or services primarily for personal . . . purposes who suffers any ascertainable loss . . . by the use . . . by a person of a method . . . declared unlawful by section two . . . may bring an action . . . in equity to recover treble damages or five hundred dollars, whichever is greater."  This language, which was not adopted, would have imposed treble damages for all violations of the Act, and joint and several liability would clearly have been appropriate.  1969 Bulletin of Committee Work, Legislative Record at 6A.

We find the analogy to the Clayton Act to be unpersuasive.  The Massachusetts Legislature consciously enacted a rule whereby the defendant's liability is measured by the degree of his culpability.  This rule completely distinguishes the multiple damage provisions of c. 93A.  Engrafting the body of law developed under the Clayton Act on c. 93A would violate the decision of the Legislature to enact a different type of statute.[19]

We find a more apt analogy in our own decisions.  We have held that concurrent wrongdoers are independently liable under statutes designed to impose a penalty.  In *Porter* v. *Sorell*, 280 Mass. 457 (1932), the court considered the meaning of the former G. L. (Ter. Ed.) c. 229, § 5 — a

---

[18] See, e.g., Hawaii Rev. Stat. § 480-13 (1976); N.C. Gen. Stat. § 75-16 (1981).  See also *Providence Hosp.* v. *Truly*, 611 S.W.2d 127, 135-137 (Tex. Civ. App. 1980) (joint and several liability under State consumer act modeled on the Clayton Act).

[19] Professor David A. Rice, a principal draftsman of c. 93A, notes that consumer statutes which do not distinguish between wilful and unintentional misconduct "are most closely analogous to the treble damage remedy of the Clayton Act."  Rice, Remedies, Enforcement Procedures and the Duality of Consumer Transaction Problems, 48 B.U.L. Rev. 559, 573 (1968).  He then argues that the Clayton Act model should be rejected in order that intentional wrongdoers will be subject to an added penalty.  *Id.* at 575-576.  See also Rice, Exemplary Damages in Private Consumer Actions, 55 Iowa L. Rev. 307, 338-340 (1969) (noting other differences between consumer and antitrust actions).

wrongful death statute — which provided that a defendant "shall be liable in damages in the sum of not less than [$500] or more than [$10,000], to be assessed with reference to the degree of his culpability." The court held that the execution in full of a judgment against one defendant did not release a concurrent wrongdoer. *Sorell, supra* at 463-464. It noted that the statute levied a penalty and reasoned that the payment by one wrongdoer of his penalty could not extinguish a penalty levied on a second wrongdoer. *Supra* at 463. The court stated that the Legislature might have provided otherwise, but that it could not "by construction add a limitation on punishment which the Legislature did not see fit to establish." *Supra* at 462.

The reasoning of *Porter* has been followed in subsequent cases.[20] In *Arnold* v. *Jacobs*, 316 Mass. 81, 84 (1944), the court held that the wrongful death statute "does not limit the amount that can be collected from a number of wrongdoers for one death" since, "as in the criminal law, each wrongdoer may be made to suffer the maximum penalty, no matter how many are guilty." See *Gaudette* v. *Webb*, 362 Mass. 60, 73-74 n.9 (1972); *O'Connor* v. *Benson Coal Co.*, 301 Mass. 145, 148 (1938).

The analogy to c. 93A is helpful. The multiple damage provisions of c. 93A are designed to impose a penalty, *Heller* v. *Silverbranch Constr. Corp.*, 376 Mass. 621, 627-628 (1978), that varies with the culpability of the defendant. *Linthicum* v. *Archambault*, 379 Mass. 381, 388 (1979). We believe that the Legislature intended that defendants would be independently liable for multiple damages under § 11.[21]

---

[20] Under Massachusetts law, punitive damages may be awarded only by statute. *Boott Mills* v. *Boston & Me. R.R.*, 218 Mass. 582, 589 (1914). Massachusetts has long-standing statutes providing for treble damages, K. Redden, Punitive Damages § 5.2(A)(21) (1980), but decisions interpreting them are sparse. But see *Proctor* v. *Proctor*, 182 Mass. 415 (1903).

[21] Twelve States provide for the imposition of punitive damages in consumer actions. Leaffer & Lipson, Consumer Actions Against Unfair or Deceptive Acts or Practices: The Private Uses of Federal Trade Commission Jurisprudence, 48 Geo. Wash. L. Rev. 521, 532 (1980). Such dam-

c. *Purpose.* Our interpretation of § 11 is consistent with the canon of statutory construction that we should interpret a statute in a manner that advances the objective of the statute. *Hayon* v. *Coca Cola Bottling Co.,* 375 Mass. 644, 648 (1978). Like other statutes containing multiple damage provisions, §§ 9 and 11 reflect "the Legislature's displeasure with the proscribed conduct and its desire to deter such conduct and encourage vindicative lawsuits." *McGrath* v. *Mishara,* 386 Mass. 74, 85 (1982). These sections also seek to promote reasonable settlements. *Nader* v. *Citron,* 372 Mass. 96, 100 (1977). These goals will be served by our construction of the statute.

The promotion of reasonable settlement offers is a prime goal of c. 93A, §§ 9 & 11. While the procedures set out in the two sections differ, they both aim at "achieving the same objectives of facilitating settlement and fixing damages." *Nader, supra.* Both sections are designed to make it "unprofitable" for a defendant to ignore meritorious claims. See *Heller* v. *Silverbranch Constr. Corp., supra* at 627. That a wilful violator can limit his liability by making a reasonable settlement offer demonstrates the critical importance of the settlement process. Indeed, the conduct proscribed by the statute is as much the failure to make a reasonable settlement offer as it is the substantive violation of c. 93A. Multiple damages are "the appropriate punishment" for forcing plaintiffs to litigate clearly valid claims. *Heller* v. *Silverbranch Constr. Corp., supra* at 628. The imposition of independent liability against multiple defendants will

ages are awarded ordinarily for "a grievous violation of societal interests." *Id.* Compare *Allen* v. *Morgan Drive Away, Inc.,* 273 Or. 614, 616 (1975) (no award of punitive damages), with *Star Credit Corp.* v. *Ingram,* 75 Misc. 2d 299, 302 (N.Y. Civ. Ct. 1973) (punitive damages awarded). The result we reach under c. 93A will be similar to that reached in States that follow the majority rule on punitive damages against joint tortfeasors. *Hotel Riviera, Inc.* v. *Short,* 80 Nev. 505, 520-521 (1964). *Kim* v. *Chinn,* 56 Cal. App. 2d 857, 860-861 (1943). See D. Dobbs, Remedies § 3.9, at 215-216 (1973); K. Redden, *supra,* § 3.3(B), at 54; Annot., 20 A.L.R.3d 648 (1968). See also *Davidson* v. *Dixon,* 386 F. Supp. 482, 489-490 (D. Del. 1974) (punitive damages under 42 U.S.C. § 1983 [1970 & Supp. 1972]), aff'd, 529 F.2d 511 (3d Cir. 1975).

promote settlements. Limiting the plaintiff to a single award of multiple damages would dilute the incentive to settle.[22] Restricting a plaintiff to a single award of multiple damages would seriously compromise the goals of punishment and deterrence in cases where several defendants have participated through their own individual acts in a single wrong.[23]

That a right of contribution is not expressed in §§ 9 and 11 further supports the imposition of independent liability. First, without independent liability, the calculus of settlement for the defendant will be tipped toward litigating the matter. The price of settling will be steep because a defendant whose offer is accepted may bear a disproportionate share of the compensatory damages. The price of litigating will be slight since a defendant may well avoid satisfying any judgment even if the underlying violation was wilful. Thus, without independent liability multiple defendants would be encouraged to litigate rather than to settle.

Second, if there were a restriction to a single award, the actual recovery from each defendant would not be tied to the degree of each defendant's culpability. The distinction between a defendant subject to double damages and one subject to treble damages would be lost. Our interpretation ensures that the intent of the Legislature will not be frustrated.

---

[22] This point distinguishes the instant case from *McGrath* v. *Mishara*, 386 Mass. 74 (1982). In *McGrath*, the court considered whether a tenant could recover multiple damages concurrently for the same harm under three overlapping statutes. We held that the goals of § 9 were "adequately served when a plaintiff has recovered one award of multiple damages." *Id.* at 86. But the wrongdoer in *McGrath* still felt the full force of a multiple damage award. Such would not be true in the instant case where the impact of the award would be shared by three defendants. Independent liability will preserve the incentive to settle which the Legislature wrote into §§ 9 and 11. Cf. *Wolfberg* v. *Hunter*, 385 Mass. 390, 398-399 (1982).

[23] Cf. *Davidson* v. *Dixon*, 386 F. Supp. 482, 489-490 (D. Del. 1974), aff'd, 529 F.2d 511 (3d Cir. 1975); *Hoffman* v. *Ryan*, 101 Misc. 2d 845, 851 (N.Y. Civ. Ct. 1979) ("if punitive damages are to be awarded to protect the public from continuation of a fraudulent consumer scheme, they must be taxed in an amount which will accomplish that purpose"), quoting *Joyner* v. *Albert Merrill School*, 97 Misc. 2d 568, 577 (N.Y. Civ. Ct. 1978); *Star Credit Corp.* v. *Ingram*, *supra.*

5. *Entry of judgments.* The jury returned the special verdicts on March 31, 1981, and the judge entered two judgments. The judgments provided that "Wilson, Jr. et al" were liable to IFIC for $19,728, plus interest, and that "Wilson [Sr.] et al" were liable to IFIC for $208,470, plus interest. In response to a motion for the entry of separate judgments filed by IFIC, the judge indicated to the parties that he would enter separate judgments on the issues of multiple damages and attorneys' fees under c. 93A.

On April 17, 1981, the judge entered new judgments in both actions on the c. 93A counts. The judgments provided that Wilson, Sr., Wilson, Jr., and Pignato were jointly and severally liable for compensatory damages plus attorneys' fees. They also provided for the assessment of double damages against Wilson, Sr., and treble damages against Wilson, Jr., and Pignato. Copies of the March 31 and April 17 judgments were mailed to the parties on April 23, 1981.

On June 22, 1981, the trial judge entered two corrected judgments and filed a memorandum to each of the judgments. Read together, they provided that Wilson, Sr., and Mrs. Wilson were liable for $208,470, plus interest; that Wilson, Sr., Wilson, Jr., and Pignato were jointly and severally liable for compensatory damages and attorneys' fees; that Wilson, Sr., was liable for double damages; and that Wilson, Jr., and Pignato were liable for treble damages. Copies of these judgments were mailed to the parties on June 22, 1981.

After the entry of the April 17 judgments, Wilson, Jr., filed a motion to correct the judgments in which motion he asked the judge to declare the April 17 judgments a nullity. He renews that claim here. He also argues here that the trial judge had no power to enter the June 22 judgments. We disagree.

We find authority for the entry of all the judgments. Massachusetts R. Civ. P. 54 (b), 365 Mass. 820 (1974), provides that "any order or other form of decision," however designated, which does not adjudicate all the rights and liabilities of all the parties, "is subject to revision at any time

before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties." The March 31 judgments did not adjudicate all the rights and liabilities of all the parties.[24] They adjudicated neither the claims for multiple damages and attorneys' fees under c. 93A nor the liability of Mrs. Wilson on the indemnity agreement. The April 17 judgments disposed of the c. 93A claims, but said nothing about Mrs. Wilson's liability on the indemnity agreement. Only the June 22 judgments adjudicated "all the claims and the rights and liabilities of all the parties." They were, therefore, the only final judgments entered.[25]

6. *The judgment against Sarah J. Wilson.* The only remaining issue for our consideration is whether the judgment entered against Sarah J. Wilson is valid. She contends that the judgment should be set aside since no default judgment was entered against her, no counsel appeared on her behalf, and she had no notice of any actions taken as a result of any motions or of the trial.[26] We hold the judgment to be valid.

---

[24] Counsel for Wilson, Jr., was informed on March 31, 1981, that the judge intended to reserve for himself the issue of multiple damages and attorneys' fees. Counsel made no objection and certainly should have understood that the judgment entered that day was not a final judgment.

[25] We note also that even if the April 17 judgment constituted a final judgment, the trial judge still retained power to enter the later judgments. Under Mass. R. Civ. P. 60 (a), 365 Mass. 828 (1974), the trial judge retains the power on his own initiative, or on the motion of any party, to correct errors in any judgment and order arising from oversight and omission.

Also, Mass. R. Civ. P. 59 (e), 365 Mass. 827 (1974), provides that a motion to alter or amend the judgment must be filed within ten days of the entry of judgment. IFIC filed such a motion on March 31, which permitted the judge to enter the April 17 judgment. Wilson, Jr., filed a similar motion within ten days of the April 17 motion. That motion permitted the judge to reconsider the propriety of his earlier judgment. It was not limited to the matters raised by Wilson, Jr. *Continental Casualty Co.* v. *American Fidelity & Casualty Co.*, 186 F. Supp. 173, 176-180 (S.D. Ill. 1959), aff'd, 275 F.2d 381 (7th Cir. 1960).

[26] Mrs. Wilson did not file a motion under either Mass. R. Civ. P. 55 (c), 365 Mass. 822 (1974), or Mass. R. Civ. P. 60, to have the judgment set aside. Whether the judgment should be set aside in accordance with the provisions of those rules is a question which is therefore not before us. Her claim here is limited to the absence of notice as provided in Mass. R. Civ.

The record reveals that Mrs. Wilson took an active part in the case before her counsel withdrew. She was served with a summons, a complaint, interrogatories, and requests for admissions. She filed an answer and served interrogatories on IFIC. She was also deposed by IFIC. In July, 1980, the judge ordered her attorney to limit his representation to one party.[27] He withdrew from representing Mrs. Wilson and Wilson, Sr., but continued to represent Wilson, Jr. Mrs. Wilson took no further steps until she filed a notice of appeal pro se on April 28, 1981. She also filed a second notice of appeal on July 14, 1981, and entered an appearance before this court through the same attorney.

We conclude that Mrs. Wilson failed to meet her responsibility to keep herself apprised of the case. She had ample notice of the case through her participation in the pretrial proceedings. Further, Wilson, Sr.'s, appearance pro se in-

---

P. 55 (b) (2). This claim can be raised here without first having sought to vacate the judgment under Rule 55 (c). 10 C.A. Wright & A.R. Miller, Federal Practice and Procedure § 2695, at 329 (1973).

[27] The propriety of the judge's order has not been challenged and is therefore not before the court. The attorney for the defendants makes no argument that the judge was incorrect in his decision that the joint representation of Wilson, Sr., Wilson, Jr., and Mrs. Wilson created a conflict of interest.

Concerning the same attorney's representation of these defendants before this court, the arguments he advanced for one defendant, if adopted by the court, would have undermined his argument with regard to the other defendants. Furthermore, the argument he presented on behalf of Mrs. Wilson tended to place him in an embarrassing position. If he had carried out his responsibilities under S.J.C. Rule 3:07, DR 2-110, as appearing in 382 Mass. 768 (1981), we do not see how she could complain here. An attorney who would have been free to inquire whether defendants' trial counsel had carried out his responsibilities may have been in a superior position to argue Mrs. Wilson's case here.

An attorney is an officer of the court and owes a duty to it. Here, the trial judge entered an order barring the attorney for Wilson, Sr., Wilson, Jr., and Mrs. Wilson from representing multiple defendants. That order did not expire with the conclusion of the trial. We would have, therefore, expected counsel to comply with its provisions until he obtained a release from it. The fact that the other parties did not object to his violating the order on the appeal is of no importance. The duty to obey the order ran not only to the other parties in the case but to this court.

dicates that notice of the progress of the case was sent to their residence. It is reasonable to assume that Wilson, Sr., communicated with his wife concerning the matter. See *Tartaglia* v. *Del Papa*, 48 F.R.D. 292, 294 (E.D. Pa. 1969). This assumption is supported by the fact that she filed timely appeals after both the April 17 and June 22 judgments. It is clear that she had adequate notice of the proceedings against her.

We also conclude that Mass. R. Civ. P. 55 (b) (2), 365 Mass. 822 (1974), has no application to a case where no default judgment was entered and the case went to trial.[28] See *Tartaglia* v. *Del Papa, supra.*[29] *Springfield Credit Union* v. *Johnson*, 123 Ariz. 319, 322 (1979). 6 Moore's Federal Prac-

---

[28] Massachusetts Rule of Civil Procedure 55 (b) (2), 365 Mass. 822 (1974), provides: "In all other cases the party entitled to a judgment by default shall apply to the court therefor; but no judgment by default shall be entered against an infant or incompetent person unless represented in the action by a general guardian, conservator, or other such representative who has appeared therein. If the party against whom judgment by default is sought has appeared in the action, he (or, if appearing by representative, his representative) shall be served with written notice of the application for judgment at least 7 days prior to the hearing on such application. If, in order to enable the court to enter judgment or to carry it into effect, it is necessary to take an account or to determine the amount of damages or to establish the truth of an averment by evidence or to make an investigation of any other matter, the court may conduct such hearings or order such references as it deems necessary and proper and shall accord a right of trial by jury to the parties when and as required by statute."

[29] In *Tartaglia* v. *Del Papa*, 48 F.R.D. 292 (E.D. Pa. 1969), the defendant and his sister entered an appearance in the action through counsel and filed an answer. Counsel later withdrew, and the defendants were so notified. The case went to trial with only the defendant's sister, a codefendant in the action, appearing. After the presentation of evidence, the trial judge entered a judgment against the defendant. Several months later, the defendant filed a motion to have the judgment against him set aside.

The judge denied the defendant's motion. He stated that the defendant had a duty to apprise himself of the progress of the case. He noted that the defendant had failed to demonstrate how he had been prejudiced by the lack of notice for trial. He also rejected the contention that notice was required to be sent as provided in Fed. R. Civ. P. 55 (b) (2). *Tartaglia, supra* at 294. He reasoned that since no motion for a default judgment was made and the case had gone to trial, the rule had no application.

tice par. 55.02[3] n.12 (1982 & Supp. 1982-1983). Further, Mrs. Wilson has not demonstrated how she was prejudiced by the alleged lack of notice for trial. Cf. *United States* v. *Borchers,* 163 F.2d 347, 349-350 (2d Cir.), cert. denied, 332 U.S. 811 (1947). Her admission that she signed the indemnity agreement made the issue of liability a foregone conclusion. She does not indicate what additional evidence, if any, she might have introduced on the issue of damages. Certainly, her codefendants had ample opportunity to press that issue below. In any event, she had an opportunity to retain counsel or to put before the jury any evidence she desired. We conclude that the judgment against her is valid.

*Judgments affirmed.*