Cratsley, J.
In September of 1987 the plaintiffs opened a clothing boutique named “the Ritz” inside the premises of Pleasures, a fashionable hair salon located on Beacon Street in Brookline. The Ritz subsequently failed. The plaintiffs now seek damages from the several defendants, asserting claims sounding in breach of warranty of habitability and quiet enjoyment, M.G.L.c. 93A, and deceit.
The plaintiffs timely commenced this action by filing a complaint with the Norfolk Superior Court in 1988. The plaintiffs filed their Second Amended Complaint on July 10, 1989. Atrial, without jury, was held between April 20, 1993 and June 10, 1993. Testimony was heard on seven separate days and 43 exhibits were entered into evidence. The several defendants contend that their actions related to the plaintiffs’ business do not render them liable in any way to the plaintiffs.
*520 FINDINGS OF FACT
Based upon all the credible testimony presented at trial, and upon the exhibits entered into evidence, this Court finds the following facts:
At all relevant times Cambridge Equity Associates, Inc. (“Associates”) was a business duly registered with the Secretary of State’s Office for the Commonwealth with a regular and usual place of business at Cambridge, Middlesex County. Associates is the successor in interest to Washington Square Associates, Inc. At all relevant times Steven Cohen (“Cohen”), an individual with a regular and usual place of business at Cambridge, Middlesex County, was acting as the duly authorized agent for Washington Square Associates, and subsequently Associates, with regard to all lease-related activities that are the subject of this action. In 1983 Associates, as lessee, entered into a twenty-year master lease on a block of stores on Beacon Street in Brookline, including the premises at 1626 Beacon Street (the “Premises”). Associates in turn, as the master-lessor, leased the Premises to Rich-Camiel, Inc. for a term of five years commencing August 10, 1983. (Exhibit 6.)
Roberta Camiel (“Camiel”), a named individual defendant here, and Martin Rich (“Rich”), also an individual, owned Rich-Camiel, Inc. (“Rich-Camiel”), a business duly registered with the Secretary of State’s Office for the Commonwealth from 1983 to 1987, with a regular and usual place of business at Revere, Suffolk County. Rich-Camiel extensively renovated the Premises into a fashionable hair salon, which it opened under the name “Pleasures” in 1983. (Exhibit 2.) By late 1986 Pleasures was experiencing financial difficulties and had fallen behind on its rent payments to Associates. On February 18, 1987 Associates sent Rich-Camiel a Notice to Quit for non-payment of rent. (Exhibit 7.) On April 29, 1987 Rich-Camiel entered into an eviction proceeding settlement with Associates signed by Cohen that provided for the payment to Associates of a lump sum of cash for the rent arrear-ages in exchange for which Pleasures was authorized to stay on as a tenant at will. (Exhibit 8.) The settlement further provided explicitly that Rich and Camiel would use their best efforts to sell Pleasures and to find a new tenant for the Premises.
Shortly after April 29, 1987 Rich and Camiel agreed to dissolve Rich-Camiel in exchange for a payment of funds by Rich to Camiel. Rich-Camiel was promptly dissolved and Camiel became the successor in interest to Rich-Camiel. Thereafter Camiel listed Pleasures for sede with a business broker. Camiel also placed a sign in the front window at the Premises offering to rent out part of the space at the Premises for a retail store. Camiel continued to be Pleasures’ general manager and worked there daily.
Robert Quinn (“Quinn”), a named individual defendant here with a regular and usual place of business at Boston, Suffolk County, became aware that Pleasures was for sale. Quinn, a licensed hairdresser since 1985, had worked for three or four years as the manager of a salon in West Roxbury where he had supervised twenty-three employees. By the summer of 1987, Quinn wanted to buy his own business. Camiel arranged to have Quinn meet with Cohen in early July 1987 to discuss a new lease for Pleasures. After this meeting Cohen sent Quinn a written lease proposal dated July 22, 1987. (Exhibit 3.)
During this same period of time the plaintiffs were searching for suitable space in which to open a clothing boutique to sell fashionable women’s clothing and accessories. Collectively the plaintiffs had some previous experience in retail sales. Sanjar Azar (“Azar"), an individual, had studied business administration while attending college in the United States. After college he stayed in the United States, working first at a bank’s branch office on a college campus and later as a loan officer at a mortgage company. He subsequently started an international trading firm with his family, Shak-Mak Ltd., which was in operation in 1987. Ata Ilderem (“Ilderem”), an individual, had six years experience operating retail stores, including one year as the owner of a sporting goods store in California. Zagros International Corporation (“Zagros”), a business duly registered with the Secretary of State’s Office for the Commonwealth with a regular and usual place of business in Brookline, Norfolk County, was formed by Azar and Ilderem and their respective families to set up and operate a clothing boutique and to engage in international trading. Azar and Ilderem were Zagros’ two executive officers.
In early July 1987 Azar saw the sign in Pleasures’ window offering space for rent (the “Space”). When Azar first spoke to Camiel about leasing the Space, which comprised an upstairs balcony area as well as an area on the main floor, Camiel showed Azar the salon’s appointment book and told him that the salon booked about seven hundred appointments per week. Camiel told Azar that she would be willing to assist Azar and Ilderem in setting up their boutique by helping them select appropriate merchandise and by introducing Pleasures’ clients to them. Azar and Ilderem were impressed by Camiel’s gracious manner and by the salon’s appearance as a well established, thriving business. They considered Pleasures to be a good location in which to operate a women’s clothing boutique because of the stylish environment at the salon and because the salon’s customers would provide a steady stream of potential clients for their clothing boutique.
After several meetings between Azar, Ilderem, their parents, and Camiel, the plaintiffs offered to rent the Space for two thousand dollars per month. On July 17, 1987 Camiel met with Azar at the Family Restaurant in Brookline and gave Azar a handwritten note dated July 17, 1987 in which she stated that the Space at Pleasures was rented to Azar for $2000 per month *521 commencing September 1, 1987, with “[djetails to be in sublease contract.” (Exhibit 13.) Camiel told Azar that he would have to meet with Cohen to finalize the sublease. Camiel did not reveal to Azar Pleasures’ status as a tenant at will or her intention to sell Pleasures.
On or about the last business day in July 1987 or the first business day in August 1987, Camiel brought Azar and Ilderem to Cohen’s office in Cambridge to discuss the plaintiffs subleasing the Space from Pleasures. At the meeting a negotiation ensued over the amount of the total rent to be paid by the plaintiffs. Cohen initially wanted the plaintiffs to pay $2000 per month plus certain utilities. The plaintiffs protested that Camiel had represented that their total rent would be $2000 per month including utilities. Camiel sided with the plaintiffs and Cohen finally told the plaintiffs that he would agree to $2000 per month including utilities. The plaintiffs indicated that they wished to open for business in early September and that time was of the essence to them. At no time during this meeting did Azar or Ilderem inquire as to the status of Pleasures’ tenancy at the Premises. Neither Camiel nor Cohen brought up Pleasures’ status as a tenant at will or the eviction proceeding settlement of April 29, 1987 which provided that Camiel would use her best efforts to sell Pleasures. (Exhibit 8.) Cohen did, however, explicitly state that the plaintiffs would be subleasing space from Pleasures for a term of years pursuant to a forthcoming written sublease. Both plaintiffs testified that they believed that Pleasures was an established business that would be carrying on its business activities at the Premises in a status quo manner. Both Camiel and Cohen stood to benefit financially from having the plaintiffs sublease space at Pleasures. Both of the individual plaintiffs testified that had they been advised at this meeting of the true nature of Pleasures’ tenancy and of the potential change in ownership, the plaintiffs would have abandoned their intent to sublease space at the Premises.
In reliance on the representations made to them by Camiel and Cohen at their meeting, the plaintiffs immediately commenced renovating the Space at Pleasures. They employed a carpenter who did certain work to make the balcony area suitable for retail clothing sales. They made arrangements to have carpet installed in the balcony, and installed various display cabinets downstairs as well as a new multi-line phone system.
On August 10,1987 the plaintiffs received a written “proposal to sublet space” (the “Proposal”) from Cohen. (Exhibit 4.) The Proposal differed in several respects from what the plaintiffs had understood Cohen to agree to at their meeting at his office. Specifically, the Proposal provided for rent increases in years two and three, as well as for charges for utilities in years two and three. The plaintiffs wrote various handwritten modifications on the Proposal and had Camiel initial their modifications. The plaintiffs testified that Camiel assured them that Cohen would go along with the modifications and that a written sublease would be forthcoming soon. Azar returned the marked-up Proposal to Cohen with a cover letter dated August 20, 1987 in which Azar requested that Cohen incorporate the plaintiffs’ modifications into a written sublease for the plaintiffs to have reviewed by their attorney. (Exhibit 5.) Cohen did not respond to Azar’s letter. During the next week the plaintiffs testified that Camiel repeatedly assured them in person that everything was on track and that it was just a matter of time before Cohen would send over the sublease. The plaintiffs also called Cohen’s office repeatedly and each time were told to leave a message for Cohen. Cohen never returned the plaintiffs’ phone calls. Instead, Cohen made a site visit to the Premises during the last week of August where he observed, without protesting to the plaintiffs, that the plaintiffs’ renovations to the Space were in progress.
During August 1987 Camiel negotiated with Quinn as to the terms upon which she would sell Pleasures to him. Quinn did not respond to Cohen’s lease proposal of July 22, 1987. (Exhibit 3.) Camiel told the plaintiffs in mid-August 1987 that she was bringing in a new partner to run Pleasures with her. She did not tell the plaintiffs or any of Pleasures’ employees of her plans to sell Pleasures to Quinn. Camiel explained in her testimony at trial that the industry norm is not to disclose pending sales of salons. On September 1, 1987 Camiel sold Pleasures to Quinn and his brother Jarlath Quinn.
That same day, September 1, 1987, Camiel asked Azar to meet with her at the Family Restaurant in Brookline. There she introduced Quinn to Azar as the new owner and general manager of Pleasures. Azar testified that he was shocked and immediately inquired as to the status of the plaintiffs’ forthcoming sublease under Pleasures’ new ownership. Quinn told Azar that he would be happy to honor Camiel’s arrangement to sublease space to the plaintiffs. As of September 1, 1987 Pleasures was a tenant at will at the Premises. At no time thereafter during the relevant time period did Pleasures enter into a written lease with Associates for the Premises. At no time did Quinn enter into a written sublease with the plaintiffs for space at the Premises. The plaintiffs never held any property right in the Premises greater than that of a tenant at will.
Azar and Ilderem testified at trial that they had already expended a substantial sum of money on start-up expenses for their new boutique, the Ritz, as of September 1, 1987 when they learned that Pleasures had been sold to Quinn. The plaintiffs’ credibility, however, is impaired on this issue by their failure to produce receipts at trial for what they described as cash expenditures. After a comprehensive review of all the exhibits entered into evidence, this Court finds *522 that the plaintiffs had incurred as of September 1, 1987 the following non-recoverable expenses in preparation for opening their boutique specifically at Pleasures in Brookline:
From Exhibit 23B:
1. Receipt dated 8/8/87 from Borison’s Floor Coverings for deposit on carpet: $300.00
From Exhibit 26:
2. Receipt dated 7/30/87 from Town Clerk of Brookline for business certificate: $15.00
3. Receipt dated 7/30/87 from Banacom Instant Signs for large paper banner to announce opening: $37.80
4. Receipt dated 8/25/87 from Trans-Star Trucking Co. for delivery of 5 sheets slatwall: $54.43
5. Receipt dated 8/27/87 from NHD Super Hardware Store for fasteners: $4.90
6. Receipt dated 8/27/87 from General Communications for installation of phone system: $92.75
From Exhibit 27A:
7. Canceled check #105 dated 8/3/87 made out to Post Master of Boston for one year rent on post office box: $31.00
From Exhibit 27B:
8. Canceled check #111 dated 8/15/87 made out to Cash with notation on memo line that funds were for carpenter’s renovation work at Pleasures: $1,210.00
TOTAL: $1,745.88
Although the plaintiffs had not received a written sublease, and in spite of their knowledge on September 1, 1987 that Pleasures had been sold to Quinn and his brother, the plaintiffs decided to press on with opening their boutique, the Ritz, at the Premises. Quinn hired Camiel to stay on through the end of December 1987 to help manage Pleasures during the transition period. The Ritz opened for business in mid-September 1987. The plaintiffs paid $2000 rent directly to Quinn each and every month that the Ritz was open at the Premises. Relations between Quinn and the plaintiffs were initially cordial. In October 1987 the plaintiffs and Quinn discussed a potential written sublease, but no written sublease was ever completed. By November 1987 tension arose between Quinn and Azar concerning, among other matters, Azar’s and Ilderem’s workday attire and Azar’s friendship with one of Pleasures’ female hairstylists.
On December 31, 1987 Quinn served the plaintiffs with a notice to quit, vacate, and surrender their space at the Premises. (Exhibit 18.) The plaintiffs refused to leave, maintaining that they had a right to be there. Quinn never took further action to evict the plaintiffs. The number of hair stylists employed by Pleasures and the number of people getting their hair done at Pleasures decreased somewhat after Quinn bought Pleasures. Several witnesses testified that Quinn was not quite as fastidious as Camiel had been in keeping Pleasures spotless, but they agreed he did employ cleaners to clean Pleasures once a week. Occasionally an electrical fuse would blow out in the fuse box inside Pleasures temporarily interrupting electricity to parts of the Premises.
The Ritz’s sales in December 1987 were encouraging to the plaintiffs, but thereafter sales dropped off significantly. Though tension continued to exist between Quinn and the plaintiffs, Quinn did not interfere with the plaintiffs use of their Space at the Premises. At all relevant times, the Premises were adequately heated, air conditioned, and cleaned, and the plaintiffs were supplied with utilities.
In late June 1988 Quinn had locking metal boxes installed over the thermostats at the Premises so that the plaintiffs could not override the automatic thermostats which were programmed to shut off the air conditioning at night. On June 30, 1988 Azar responded by forcefully removing the locking boxes with a metal wrecking bar during business hours thereby damaging the walls. (Exhibit 38, Photos of Damage.) Quinn called the police who came and made a report. (Exhibit 41.) The plaintiffs thereafter commenced a going-out-of-business sale and ultimately vacated the Premises in August 1988.
RULINGS OF LAW A. Count III: Deceit, Against Each Defendant
In order to recover in an action for deceit against any of the several defendants, the plaintiffs must prove “that the defendant or its agent made a false representation of material fact with knowledge of its falsity for the purpose of inducing the plaintiffis] to act thereon, and that the plaintiff[s] relied upon the representation as true and acted upon it to [their] damage. (Citation omitted.) See also Restatement (Second) of Torts §525 (1977) (‘One who fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to [them] by [their] justifiable reliance upon the misrepresentation’”). International Totalizing Systems, Inc. v. PepsiCo, Inc., 29 Mass.App.Ct. 424, 431 (1990). A false representation of material fact may arise not only in the context of affirmative representations, but also by the failure to fully and accurately disclose the true nature of matters about which one is making any representation. Kannavos v. Annino, 356 Mass. 42, 48 (1969) (“Although there may be ‘no duty imposed upon one party to a transaction to speak for the information of the other ... if he does speak with reference to a given point of information, voluntarily or at the other’s request, he is bound to speak honestly and to divulge all the material facts bearing upon the point that lie within his knowledge. Fragmentary information may *523 be as misleading ... as active misrepresentation, and half-truths may be as actionable as whole lies’ (citations omitted)”).
The gravamen of the plaintiffs’ deceit claim against Cohen and Camiel is that they offered to sublease space to the plaintiffs at the Premises for a term of years and failed to do so; that they led the plaintiffs to believe that Pleasures was a well established business that would continue to operate in a status quo manner when, in fact, the defendants were contemplating its sale; and that the plaintiffs reasonably relied upon the defendants’ misrepresentations and fragmentary representations to their financial detriment. It is clear from the record thatin August 1987 Cohen and Camiel offered to sublease space at the Premises from Pleasures to the plaintiffs for a term of years. It is equally clear that in August 1987 Pleasures was a mere tenant at will at the Premises and as such did not have the legal capacity to grant a sublease for a term of years. See D. A. Schulte, Inc. v. Brockton Y.M.C.A., 273 Mass. 335, 342 (1930) (a sublessee’s rights in real property derive from the rights of the lessor in the property, consequently a lessor can not transfer a greater interest in leased property than he himself holds). Thus Cohen’s and Camiel’s offer to have Pleasures sublease space to the plaintiffs for a term of years constitutes an affirmative false representation of a material fact: Pleasures’ legal capacity to sublease space for a term of years.
In addition, in the course of offering to sublease space Cohen and Camiel provided the plaintiffs with fragmentary information concerning Pleasures’ ownership in a manner that this Court finds was calculated to mislead the plaintiffs into believing that Camiel would remain as owner. At their initial meeting to discuss a sublease Cohen and Camiel represented to the plaintiffs that Camiel owned Pleasures without further communicating that Pleasures was for sale. Cohen knew that Camiel was then currently attempting to sell Pleasures. Then, in mid-August 1987, Camiel volunteered to the plaintiffs that she was bringing in Quinn as a new partner to help run Pleasures when, in fact, she was fully contemplating a sale of the entire business to him. This Court finds that the contemplated change in ownership of Pleasures was a material fact that Cohen and Camiel intentionally concealed from the plaintiffs by providing them with incomplete information about Pleasures’ current and future ownership. See Kannavos v. An-nino, 356 Mass, at 48 (“[f]ragmentaiy information may be as misleading ... as active misrepresentation”). The plaintiffs reasonably relied on Cohen’s and Camiel’s concerted misrepresentations of material facts to their detriment, rendering Cohen and Camiel liable in deceit.
In order for the plaintiffs to recover damages from Cohen and Camiel, the plaintiffs must prove that the harm suffered was proximately caused by Cohen’s and Camiel’s tortious conduct. See Johnson v. Summers, 411 Mass. 82, 88 (1991), cert. denied, 112 S.Ct. 1166 (1992). The plaintiffs must prove by a preponderance of the evidence that Cohen’s and Camiel’s tortious conduct caused the plaintiffs to sustain actual damages. See Flag Fables, Inc. v. Jean Ann’s Country Flags & Crafts, Inc., 753 F.Supp. 1007, 1010 (D.Mass. 1990). The plaintiffs stipulated in open court that Cohen could only be liable for expenses incurred by the plaintiffs through September 1, 1987. The plaintiffs contend that they are entitled to recover from Cohen up to $100,000 for any and all funds expended on behalf of the Ritz through September 1, 1987 and from Camiel up to $100,000 for any and all funds expended on behalf of the Ritz at any time.
This Court finds that the only actual damages sustained by the plaintiffs that were proximately caused by Cohen and Camiel were those funds expended by the plaintiffs through September 1, 1987 in anticipation of opening the Ritz specifically at the Premises. This Court further finds that funds spent through September 1, 1987 on items that were not location dependent, such as merchandise, are not damages proximately caused by Cohen and Camiel. On September 1, 1987 the plaintiffs were informed that Pleasures had been sold and the plaintiffs were then aware that they had not yet received a written sublease for a term of years. The funds expended through September 1,1987 to renovate the Space were expended in reliance upon Cohen’s and Camiel’s tor-tious misrepresentations. If the plaintiffs had abandoned their business venture completely on September 1, 1987, instead of pressing on as they did, they might have been able to claim further damages against Cohen and Camiel. As it stands, however, the plaintiffs have not established by a preponderance of the evidence that any losses incurred after September 1, 1987 were proximately caused by Cohen or Camiel rather than by other factors such as general business conditions or the plaintiffs’ own business aptitude. Furthermore, any losses on funds expended through September 1, 1987 for items that were not site specific to opening the Ritz at the Premises are not damages proximately caused by Cohen or Camiel given that the plaintiffs in fact operated their business for approximately one year after September 1, 1987. Thus, on Count III: Deceit, this Court finds that Cohen and Camiel, as joint tortfeasors, are jointly and severally liable to the plaintiffs in the amount of $1,745.88. See International Fidelity Ins. Co. v. Wilson, 387 Mass. 841, 844 (1983) (joint and several liability imposed upon joint tortfeasors).
The plaintiffs allege that Quinn and his brother Jarlath Quinn d/b/a Pleasures are liable in deceit for up to $100,000 for the plaintiffs’ losses. Quinn had no contact with the plaintiffs until September 1, 1987. Thereafter, the only evidence of any possible misrepresentation on his part is that in October 1987 he *524 discussed giving the plaintiffs a sublease for a term of years when Quinn knew that Pleasures itself was only a tenant at will at the time. Quinn never gave the plaintiffs a written sublease, but he allowed the plaintiffs to conduct their business at the Premises until the plaintiffs left of their own accord in August 1988. The plaintiffs’ claim in deceit against the Quinns d/b/a Pleasures fails because the plaintiffs have not established by a preponderance of the evidence that the Quinns d/b/a Pleasures were the proximate cause of any of the plaintiffs’ damages.
Similarly, the plaintiffs’ claim in deceit against Rich-Camiel, Inc. must fail because Rich-Camiel, Inc. had been dissolved and had ceased to exist as a legal entity before the plaintiffs had any contact with it.
B. Count II: M.G.L.c. 93A, Against Each Defendant
In order to recover under M.G.L.c. 93A, the plaintiffs, who were engaged in commerce, must demonstrate that they have lost money or property “as a result of the use or employment by another person who engages in any trade or commerce of an unfair method of competition or an unfair or deceptive act or practice.” M.G.L.c. 93A, §11. The type of activity constituting an unfair or deceptive act or practice is one that: “ ‘(1) [is] within at least the penumbra of some common-law, statutory, or other established concept of unfairness: (2) . . . is immoral, unethical, oppressive, or unscrupulous . . .’ ” Levings v. Forbes & Wallace, Inc., 8 Mass. App. Ct. 498, 504 (1979), quoting 29 Fed. Reg. 8325, 8355 (1964). Furthermore, under §11 the activity must attain “a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce.” Levings v. Forbes & Wallace, Inc., 8 Mass.App.Ct. at 504.
Whether a given practice runs afoul of these touchstones must be determined from the circumstances of each case. Don Lorenz, Inc. v. Northampton National Bank, 6 Mass.App.Ct. 933 (1978). “Liability (and the extent of liability) under c. 93A turns on an appraisal of the allegedly culpable conduct of the entity charged with violating that chapter.” Zayre Corp. v. Computer Systems of America, Inc., 24 Mass.App.Ct. 559, 570 (1987). The “circumstances of the entire transaction including the knowledge and motives of the parties” may be relevant in determining liability under G.L. c. 93A. Sheehy v. Lipton Industries, Inc., 24 Mass.App.Ct. 188, 196 (1987). In order to recover under M.G.L.c. 93A, the plaintiffs need not show proof of actual reliance on a misrepresentation, but rather need only show by a preponderance of the evidence that there is “a causal connection between the deception and the loss and that the loss was foreseeable as a result of the deception.” International Fidelity Ins. Co. v. Wilson, 387 Mass. at 850.
The plaintiffs contend that Cohen and Camiel are liable to them under M.G.L.c. 93A, §11 for making various self-serving, false, and misleading representations which induced them to open the Ritz at the Premises. The plaintiffs contend that their losses were caused by Cohen’s and Camiel’s actions and that such losses were a foreseeable consequence of the deceptive representations. This Court finds that Cohen and Camiel were engaged in commerce for purposes of M.G.L.c. 93A, §11.
To recover under M.G.L.c. 93A in a commercial leasing situation, a plaintiff must show more than a breach of an oral agreement to lease space. Madan v. Royal Indemnity Co., 26 Mass.App.Ct. 756, 762-63 (1989) (to establish violation of M.G.L.c. 93A, “the plaintiff must show ‘unfair or deceptive acts or practices’ other than [a mere] breach” of an oral agreement to lease space). A violation of M.G.L.c. 93A may be found where a commercial lessor induces a potential lessee to take detrimental actions in reliance on a series of false representations concerning a forthcoming lease that never materializes. Greenstein v. Flatley, 19 Mass.App.Ct. 351, 356 (1985) (M.G.L.c. 93A, §11 violation found where “the pattern of conduct of the defendant and its agents was calculated to misrepresent the true situation to the plaintiff, keep him on a string, and make the plaintiff conclude — reasonably— that the deal had been made and that only a bureaucratic formality remained”). In the instant case Cohen and Camiel engaged in a concerted pattern of conduct over a time period of at least one month calculated to mislead the plaintiffs into believing that Pleasures had the legal capacity to grant a sublease for a term of years and that the plaintiffs would definitely receive such a sublease. Because the conduct of Cohen and Camiel was misleading, “it fits comfortably ‘within at least the penumbra of some commonlaw, statutory, or other established concept of unfairness’ (citation omitted)” and establishes a violation of M.G.L.c. 93A. Id.
The compensatory damages that the plaintiffs are entitled to recover from Cohen and Camiel under M.G.L.c. 93A are the plaintiffs’ actual foreseeable losses that were caused by Cohen’s and Camiel’s unfair or deceptive acts or practices. See International Fidelity Ins. Co. v. Wilson, 387 Mass. at 850. This Court finds that Cohen and Camiel are jointly and severally liable to the plaintiffs in the amount of $1,745.88 in compensatory damages plus reasonable attorneys’ fees[3] and costs. See id. at 858-59 (where several defendants have participated through their own individual acts in a single wrong, liability for compensatory damages, attorneys’ fees, and costs is joint and several). The $1,745.88 compensatory damage figure is the same as that determined for Cohen’s and Camiel’s compensatory damages liability under Count III: Deceit. The reasoning is identical. Since the plaintiffs chose to press on with their business at the Premises after September 1, 1987, the plaintiffs have failed to established by a preponderance of the evidence that there is a causal connection between Cohen’s and Camiel’s on-going actions and any com *525 pensatory damages in excess of the detailed $1,745.88.
In addition to compensatory damages, M.G.L.c. 93A, § 11 provides that if a court determines that there has been a “willful or knowing violation” of M.G.L.c. 93A by a defendant(s), then the court shall award multiple damages to the plaintiff(s). M.G.L.c. 93A, §11. The multiple damage component is intended to be punitive and shall be two to three times the amount of the compensatory damages awarded depending on the egregiousness of each defendant’s conduct. International Fidelity Ins. Co. v. Wilson, 387 Mass. at 853-58. Each defendant is individually liable for any multiple damage component adjudged againsthim. Id. Prejudgment interest is not added to a multiple damages award assessed under M.G.L.c. 93A. McEvoy Travel Bureau, Inc. v. Norton Co., 408 Mass. 704, 718 (1990).
Both Cohen and Camiel knowingly violated M.G.L.c. 93A by representing to the plaintiffs as true that which they knew to be false, specifically, by representing that Pleasures had the legal capacity to grant a sublease for a term of years when in fact it did not because it was only a tenant at will. Computer Sys. Eng’g. Inc. v. Qantel Corp., 571 F.Supp. 1365, 1375 (D.Mass. 1983), aff'd, 740 F.2d 59 (1st Cir. 1984) (in order to prove a knowing violation by fraud, the plaintiff may show that the agents of the defendant knew “that the fact that they represented to be true was not true”). Furthermore, and as previously noted, supra, the fact that Pleasures was in the process of being sold to Quinn was never communicated to the plaintiffs who believed they would sublet from and deal with Cohen and Camiel. This Court finds that Cohen’s and Camiel’s knowing violation of M.G.L.c. 93A renders them each individually liable to the plaintiffs for multiple damages in the amount of two times the compensatory damages of $1,745.88, or $3,491.76.
The plaintiffs’ M.G.L.c. 93A claim against Quinn and his brother Jarlath Quinn d/b/a Pleasures must fail because the plaintiffs have failed to establish by a preponderance of the evidence that these defendants committed any unfair or deceptive act or practice that caused the plaintiffs to suffer any loss. Similarly, the plaintiffs’ M.G.L.c. 93A claim against Rich-Camiel, Inc. must fail because Rich-Camiel, Inc. had been dissolved and had ceased to exist as a legal entity before the plaintiffs had any contact with it.
C. Count I: Breach of Warranty of Habitability and Quiet Enjoyment Against Defendants Quinn
The plaintiffs contend that the Quinns are liable to them for breach of warranty of habitability and quiet enjoyment by bringing an eviction proceeding against them; for interfering with the plaintiffs’ commercial use of the Space by failing to provide adequate cleaning services, air conditioning, and utilities; and for acting in a hostile manner towards them at the Premises. “The covenant of quiet enjoyment is violated by acts that amount to ‘serious interferences with [the] tenancy.’ (Citations omitted.) A violation of the covenant connotes acts by the landlord (or by his sufferance) that substantially ‘impair the character and value of the leased premises.’ (Citations omitted). An eviction proceeding, particularly where it is unsuccessful or is aborted, cannot be said to impair the character and value of the leased premises as those words are used in the cases." Rahman v. Federal Management Co., 23 Mass.App.Ct. 701, 705 (1987).
The plaintiffs’ claim for breach of warranty of habitability and quiet enjoyment must fail as it is not supported by the factual record in this case. Though Quinn commenced an eviction proceeding by serving the plaintiffs on December 31, 1987 with a notice to quit, the plaintiffs protested and Quinn did not evict the plaintiffs. Moreover, Quinn allowed the plaintiffs to continue using the Space at the Premises until the plaintiffs eventually left of their own volition in August 1988. Although there was some testimony that the Premises were not cleaned as often during Quinn’s tenure as when Camiel owned Pleasures, the plaintiffs have failed to establish that the Premises were uninhabitable at any time. There was also testimony that occasionally an electrical fuse in the fuse box would blow out temporarily interrupting power service. A fuse blowing out is a minor inconvenience to be expected and it does not constitute a serious interference with the plaintiffs’ tenancy. Similarly, testimony that Quinn lowered the air conditioning during the day and turned off the air conditioning at night after business hours using automated thermostats does not establish a serious interference with the plaintiffs’ tenancy. The Quinns are not liable to the plaintiffs for breach of warranty of habitability and quiet enjoyment.
D. Damages
Where an injury is incurred because of conduct that comprises the elements of any common law, statutory or regulatory cause of action which also gives rise to liability under M.G.L.c. 93A, as is the case here, recovery of cumulative damages under multiple counts is not allowed. Calimlim v. Foreign Car Center, Inc., 392 Mass. 228, 235 (1984). Therefore, the plaintiffs may only collect one set of compensatory damages, plus reasonable attorneys’ fees and costs under M.G.L.c. 93A, plus multiple damages under M.G.L.C 93A from the following defendants as follows:
(1) Quinn and Jarlath Quinn d/b/a Pleasures: no liability;
(2) Rich-Camiel, Inc: no liability;
(3) Cohen and Camiel:
a) Joint and several liability for $1,745.88 of compensatory damages with prejudgment interest as follows:
From Exhibit 23B:
*526 1. Receipt dated 8/8/87 from Borison’s Floor Coverings for deposit on carpet: $300.00 From Exhibit 26:
2. Receipt dated 7/30/87 from Town Clerk of Brookline for business certificate: $15.00
3. Receipt dated 7/30/87 from Banacom Instant Signs for large paper banner to announce opening: $37.80
4. Receipt dated 8/25/87 from Trans-Star Trucking Co. for delivery of 5 sheets slatwall: $54.43
5. Receipt dated 8/27/87 from NHD Super Hardware Store for fasteners: $4.90
6. Receipt dated 8/27/87 from General Communications for installation of phone system: $92.75
From Exhibit 27A:
7. Canceled check #105 dated 8/3/87 made out to Post Master of Boston for one year rent on post office box: $31.00
From Exhibit 27B:
8. Canceled check #111 dated 8/15/87 made out to Cash with notation on memo line that funds were for carpenter’s renovation work at Pleasures: $1,210.00
Compensatory Damages: $1,745.88;
b) Joint and several liability for reasonable attorneys’ fees and costs pursuant to M.G.L.c. 93A;
4. Cohen: Individual liability under M.G.L.c. 93Afor multiple damages equal to two times the compensatory damages of $1,745.88, or $3,491.76, with no prejudgment interest; and
5. Camiel: Individual liability under M.G.L.c. 93A for multiple damages equal to two times the compensatory damages of $1,745.88, or $3,491.76, with no prejudgment interest.
ORDER
After trial on the merits and for the reasons discussed above, it is hereby ORDERED that judgment enter for the plaintiffs in the amount of one thousand seven hundred forty-five dollars and eighty-eight cents ($1,745.88), plus prejudgment interest as provided by law, against defendants Steven Cohen and Roberta Camiel jointly and severally. It is further ORDERED that judgment enter for the plaintiffs for multiple damages in the amount of Three thousand Four Hundred Ninety-one Dollars and Seventy-six cents ($3,491.76), with no prejudgment interest, against defendant Steven Cohen. It is further ORDERED that judgment enter for the plaintiffs for multiple damages in the amount of Three Thousand Four Hundred Ninety-one Dollars and Seventy-six cents ($3,491.76), with no prejudgment interest, against defendant Roberta Camiel. It is further ORDERED that reasonable attorneys’ fees and costs be awarded to the plaintiffs against defendants Steven Cohen and Roberta Camiel jointly and severally after NOTICE to all counsel and a separate hearing on the matter.

 The quality of the plaintiffs’ attorney’s written submissions to this Court will be considered by this Court in arriving at a figure for reasonable attorneys’ fees.