MARCIA RHODES & another[1] vs. AIG DOMESTIC CLAIMS, INC., & others.[2]

No. 09-P-619.

Suffolk. January 12, 2010. - November 23, 2010.

Present: CYPHER, BERRY, & TRAINOR, JJ.

Further appellate review granted, 459 Mass. 1101 (2011).

*Insurance,* Settlement of claim, Unfair act or practice. *Consumer Protection Act,* Insurance, Damages, Unfair or deceptive act. *Statute,* Construction. *Damages,* Consumer protection case. *Words,* "Injury."

In a civil action claiming violations by the defendant insurer of G. L. c. 176D, § 3(9)(f), and G. L. c. 93A, §§ 2 and 9, the judge erred in denying recovery for the insurer's failure to initiate the settlement process once the merits of the plaintiffs' underlying tort claims were clear, where the insurer's misconduct denied the plaintiffs the opportunity to engage in the settlement process and exacerbated their losses. [304-311]

In a civil action claiming violations by the defendant insurer of G. L. c. 176D, § 3(9)(f), and G. L. c. 93A, §§ 2 and 9, the measure of damages caused by the insurer's tardy but reasonable settlement offer, which was rejected by the plaintiffs, was the loss of use, rather than the judgment obtained in the plaintiffs' underlying tort action; further, such damages were to be calculated between the date the insurer committed a breach of its duty to make an initial settlement offer and the date the insurer finally made its offer. [311-313] BERRY, J., dissenting.

In a civil action claiming violations by the defendant insurer of G. L. c. 176D, § 3(9)(f), and G. L. c. 93A, §§ 2 and 9, there was no error in the judge's determination that the insurer violated its statutory duty by unreasonably delaying settlement with the plaintiffs after the verdict in the underlying tort action [313-314]; further, the judge properly multiplied the plaintiffs' loss of use damages, rather than the amount of the judgment in the underlying tort action, for the insurer's wilful and knowing violation in delaying the offer of a reasonable settlement after the verdict in the underlying tort action [314-315].

In a civil action claiming violations by the defendant insurers of G. L. c. 176D, § 3(9)(f), and G. L. c. 93A, §§ 2 and 9, the judge did not err in ruling in one insurer's favor, where the evidence supported the judge's findings that that insurer acted reasonably and made a timely tender of its full policy limits as required by G. L. c. 176D, § 3(9)(f). [315-316]

[1]Harold Rhodes, individually and as father and next friend of Rebecca Rhodes.

[2]National Union Fire Insurance Company of Pittsburgh, PA; and Zurich American Insurance Company.

CIVIL ACTION commenced in the Superior Court Department on April 7, 2005.

The case was heard by *Ralph D. Gants*, J.

*M. Frederick Pritzker* (*Margaret M. Pinkham* with him) for the plaintiffs.

*Anthony R. Zelle* for AIG Domestic Claims, Inc., & another.

*Linda L. Morkan* for Zurich American Insurance Company.

CYPHER, J. On January 9, 2002, plaintiff Marcia Rhodes (Marcia),[3] then forty-six years old, stopped her car, as directed by a police officer conducting traffic around a tree service crew, whereupon she was hit from behind by an eighteen-wheel trailer truck, leaving her instantly and permanently paralyzed. Marcia, along with her husband, Harold, and their daughter, Rebecca (collectively, the plaintiffs), are claimants under policies of insurance issued by the defendants for Building Materials Corp. of America (GAF),[4] to whom the truck driver was assigned at the time of the accident. The plaintiffs brought this action against the defendant insurers, under G. L. c. 176D, § 3(9)(f), and c. 93A, §§ 2 and 9, for failure to effectuate prompt, fair, and equitable settlements of the plaintiffs' tort claims. Principal among the issues on appeal are the plaintiffs' burden to prove that their damages were caused by a recalcitrant insurer, and the amount to be multiplied for the insurer's wilful and knowing violations of c. 93A.

We recount the facts relevant to this appeal from the trial judge's comprehensive June 3, 2008, "Findings of Fact, Conclusions of Law, and Order," summarized here and detailed further, as needed, in our discussion. Marcia was severely injured in 2002, when a truck struck her car from behind on Route 109 in Medway. At the time she was hit, she had been stopped by a patrolman at the site of tree service work being conducted by Jerry MacMillian's Professional Tree Service (Professional Tree Service). The driver of the trailer truck, Carlo Zalewski, was employed by Driver Logistics Services (DLS), and was assigned to drive the truck for GAF. GAF leased the truck from Penske Truck Leasing Corp. (Penske). GAF carried a $2 million primary

---

[3]We use first names for the sake of clarity.

[4]Building Materials Corp. of America was doing business as GAF Materials Corp., and has been referred to throughout this litigation as "GAF."

automobile insurance policy with Zurich American Insurance Company (Zurich), and a $50 million excess umbrella policy with National Union Fire Insurance Company of Pittsburgh, PA (National Union). AIG Domestic Claims, Inc. (AIGDC), formerly known as AIG Technical Services, Inc., was the claims administrator for National Union.[5]

GAF and Zurich used Crawford & Company (Crawford), as a third-party administrator for GAF's claims. Crawford received notice of the claim regarding Marcia on January 9, 2002, the day of the accident. Crawford characterized the claim as "catastrophic" and deemed it reportable to both GAF and Zurich. A Crawford report dated January 30, 2002, sent to GAF, Zurich, and AIGDC, described the accident and indicated both that Marcia was paralyzed and remained hospitalized in lifethreatening condition, and that the claim would carry a high value. A second correspondence from Crawford to GAF, Zurich, and AIGDC on April 8, 2002, reported that Zalewski, the driver of the truck, was clearly liable for the accident, and that there was the potential for contribution from Penske, Professional Tree Service, and the town of Medway. Crawford recommended that Zurich put the $2 million policy limits in reserve.

On April 16, 2002, Marcia returned home for the first time since the accident, where she was confined to a wheelchair, only to be hospitalized in May for emergency surgery. She again returned home in June, 2002. On July 12, 2002, the plaintiffs filed a civil complaint against Zalewski, DLS, Penske, and GAF (the tort action), Marcia seeking damages for her injuries, and Harold and Rebecca seeking damages for loss of consortium.[6] On November 21, 2002, Zalewski admitted to sufficient facts to support a finding of guilt as to criminal charges stemming from the accident.

In September, 2002, and May, 2003, Crawford provided Zurich and AIGDC with an estimate for the plaintiffs' case of between $5 million and $10 million. On August 13, 2003, the plaintiffs sent to GAF's counsel a "day in the life" videotape, chronicling a typical day for Marcia, now a paraplegic, and a

---

[5]For simplicity's sake, we refer to both as AIGDC.

[6]The plaintiffs amended the complaint on August 30, 2002, to add a claim against Penske for negligent maintenance.

written demand for $16.5 million, which included summarized medical expenses of $413,977.68, present value of future medical costs of $2,027,078, loss of household services of $292,379, and out-of-pocket expenses of $83,984.74.

On September 11, 2003, Crawford sent Zurich a copy of the plaintiffs' written demand and accompanying documentation, including medical records and expenses, and the videotape. Zurich then set about to verify the claims, developing its own life care plan and conferring with GAF's defense counsel concerning the claims, defenses, and value of the plaintiffs' damages. On a November 19, 2003, conference call, a Zurich claims director told GAF's counsel, along with Crawford and AIGDC, that she would seek authority to tender Zurich's policy limit of $2 million. GAF's counsel recommended that a $5 million settlement offer be made to the plaintiffs, but AIGDC's claims director refused, claiming he was new to the case and that he wanted to hire additional counsel to represent GAF and AIGDC.

Following the conference call, Zurich's claims director began compiling the necessary information for a report that was required by Zurich to obtain authorization for the $2 million tender to AIGDC. On December 19, 2003, she submitted the report, estimating the value of the claim in excess of $10 million. The individual to whom she submitted the report was leaving Zurich's employ at the end of the year, and the request for authority was forwarded to her replacement. Approval came on January 22, 2004, and on January 23, 2004, Zurich verbally tendered its policy limits to AIGDC, which indicated that it would not accept a verbal tender and needed it in writing.

In the meantime, the plaintiffs' August 13, 2003, settlement demand went unanswered. AIGDC, for its part, refused to make a settlement offer prior to mediation and claimed more discovery was needed. On March 18, 2004, GAF's counsel sent a letter to AIGDC, stating that its failure to tender settlement constituted a violation of c. 176D, § 3(9)(*f*), and c. 93A. AIGDC continued to drag its feet, however, wrangling with Zurich over defense obligations and refusing to accept Zurich's tender of its primary policy limits (conduct described by the trial judge here as "spurious"). At the end of March, 2004, GAF's counsel offered

the plaintiffs Zurich's policy limit of $2 million to settle the case, which the plaintiffs rejected.

In mid-April, 2004, the plaintiffs agreed to mediation, but AIGDC refused to proceed, claiming the need for more discovery, including depositions of Marcia and Rebecca, even though the discovery period had closed in September, 2003. Again, AIGDC stalled, waiting until July 20, 2004, to conduct an independent medical examination of Marcia and eventually forgoing the deposition of Rebecca altogether before mediation. As the trial date of September 7, 2004, loomed, AIGDC finally agreed to schedule mediation for August 11, 2004. AIGDC's claims director recommended that authority be given to make a settlement offer at mediation of $6 million, but AIGDC's claims supervisor overruled him and authorized a settlement of only $4.75 million, which included $2 million from Zurich plus $1 million from Professional Tree Service (the limits of its coverage, which AIGDC assumed it would be willing to pay; as it turned out, Professional Tree Service ultimately settled for $550,000).

At the mediation on August 11, 2004, the plaintiffs sought $15 million to settle the case. AIGDC offered $3.5 million. Harold testified at trial that he would not have accepted a settlement offer of less than $8 million at the mediation. No further settlement offers were forthcoming.

Trial on the tort action commenced before a jury on September 7, 2004. Before trial, the parties stipulated to liability, and the case proceeded on the issue of damages only. When AIGDC determined that the trial was proceeding more favorably to the plaintiffs than anticipated, AIGDC increased its offer to $6 million, which was not accepted. The jury returned its verdict on September 15, awarding the plaintiffs a total of $9.412 million on their claims; with interest and adjustments, the amount came to approximately $11.3 million. Judgment entered on the jury verdict on September 28, 2004.

AIGDC filed an appeal from the tort judgment, arguing that the verdict was excessive and that the court's denial of the defendants' motion to obtain Marcia's psychological records during discovery was reversible error. On November 19, 2004, the plaintiffs sent a c. 93A demand letter to Zurich and AIGDC, demanding reasonable settlement within thirty days. On December 17,

2004, AIGDC offered $7 million, which included Zurich's $2 million, and required the plaintiffs to release all claims under c. 176D and c. 93A. Shortly thereafter, on December 22, Zurich paid the plaintiffs $2,322,995.75, without requiring releases. The plaintiffs filed this action on April 8, 2005.

On May 2, 2005, AIGDC offered the plaintiffs a structured settlement that, combined with the other defendants, totaled $8.62 million. On June 2, 2005, the plaintiffs settled with AIGDC for $8.965 million, paid in three monthly installments, with no release of the plaintiffs' c. 176D and c. 93A claims. Adding this to the amounts paid by the other defendants, the plaintiffs were paid a total of approximately $11.835 million to settle the tort action.

This action for violations of c. 176D and c. 93A was tried to the judge over sixteen days. The judge found for the insurers on all but the plaintiffs' claims stemming from AIGDC's postverdict settlement conduct. He awarded the plaintiffs their loss of use damages for AIGDC's delay in making a reasonable settlement offer after the jury verdict, which he doubled on account of AIGDC's wilful and knowing violations of c. 176D and c. 93A.

On appeal, the plaintiffs argue that the judge erred as to the claims against AIGDC in (1) finding no liability for AIGDC's pretrial violations of c. 176D; (2) basing the postverdict violation damages on loss of use, rather than on the underlying judgment; and (3) using the wrong dates for the calculation of postverdict damages. Last, the plaintiffs argue that the judge erred by finding Zurich not liable for its pretrial conduct. AIGDC cross-appeals, arguing that the judge erred (1) in holding it liable for postverdict violations of c. 176D; and (2) in the calculation of damages.

1. *AIGDC's pretrial conduct.* a. *Liability.* The judge found that AIGDC failed to effectuate a prompt settlement of the plaintiffs' claims once liability became reasonably clear, as required by law, and that its failure was wilful and knowing. As the judge explained: "AIGDC did not delay its settlement offer to conduct the investigation needed to make liability reasonably clear; it delayed it because it thought it would be in a better strategic posture if the offer were postponed until the mediation and it did not wish the mediation to occur until trial was nearly

imminent." The judge found that liability and damages for Marcia's injuries were reasonably clear on December 5, 2003, and, with respect to AIGDC's excess policy, when Zurich tendered its policy limits on January 23, 2004. The judge concluded that, even allowing a generous amount of time for all the issues AIGDC claimed it needed to resolve, AIGDC violated its statutory duty by failing to make a settlement offer by May 1, 2004. As to the fairness of the settlement offer, the judge found that when AIGDC finally made an offer of $3.5 million to the plaintiffs on August 11, 2004, the amount was at the "low end" of the reasonable range for the plaintiffs' claims.[7]

General Laws c. 93A, § 2(*a*), inserted by St. 1967, c. 813, § 1, states that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." General Laws c. 176D, § 3, inserted by St. 1972, c. 543, § 1, for its part, prohibits "unfair or deceptive acts or practices in the business of insurance," including, in subsection (9)(*f*), the failure "to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear." General Laws c. 93A incorporates c. 176D, thereby encouraging settlement of insurance claims, whether those of an insured or a third-party claimant, and discouraging insurers from forcing claimants into unnecessary litigation to obtain relief. *Clegg* v. *Butler*, 424 Mass. 413, 419 (1997). *Hopkins* v. *Liberty Mut. Ins. Co.*, 434 Mass. 556, 564, 567-568 (2001). See generally *Morrison* v. *Toys "R" Us, Inc.*, 441 Mass. 451, 454-455 (2004) ("One obvious legislative concern was that entities that profit from selling insurance policies not abuse exclusive rights and duties to control litigation vested through those same policies"). "Together, the statutes require an insurer . . . 'promptly to put a fair and reasonable offer on the table when liability and damages become clear,

---

[7]The plaintiffs have not challenged this finding on appeal, and we therefore do not address whether the judge's determination that the August 11 offer was reasonable was "clearly erroneous," as discussed by the dissent. See Mass.R. Civ.P. 52(a), as amended, 423 Mass. 1402 (1996). Moreover, even if we were to conclude that we would have found otherwise, there is record evidence to support the judge's findings. See *Hopkins* v. *Liberty Mut. Ins. Co.*, 434 Mass. 556, 568 & n.18 (2001) (question whether offer is prompt and fair is question of fact to be resolved by trial judge).

either within the thirty-day period set forth in G. L. c. 93A, § 9(3), or as soon thereafter as liability and damages make themselves apparent.' " *Bobick* v. *United States Fid. & Guar. Co.*, 439 Mass. 652, 659 (2003), quoting from *Hopkins* v. *Liberty Mut. Ins. Co.*, 434 Mass. at 566.

The judge found that the plaintiffs incurred costs and suffered emotional distress from the uncertainties and frustrations of litigation as the matter dragged on past the point at which liability for Marcia's tort injuries became clear and a settlement offer from AIGDC was statutorily due. But the judge pointed to Harold's testimony that, by the time of the mediation, the plaintiffs would not have settled for less than $8 million as proof that the plaintiffs would have rejected AIGDC's offer of $3.5 million even if it had been put forth promptly. Based on that finding, the judge determined that a timely and reasonable settlement offer would not have materially diminished the plaintiffs' harm because they would have rejected the offer, proceeded with litigation, and incurred the costs and frustrations of litigation in any event.[8] The judge thus concluded that the plaintiffs suffered no actual damages caused by AIGDC's deliberate and strategic delay in making an offer to settle the tort action.

The plaintiffs challenge the judge's ruling that it was their burden to prove they would have accepted a settlement offer of $3.5 million, had AIGDC put forth that amount by May 1, 2004, in order to establish that they were damaged by the insurer's recalcitrance. They point to the admonition of the Supreme Judicial Court that "[a]n insurer's statutory duty to make a prompt and fair settlement offer does not depend on the willingness of a claimant to accept such an offer." *Hopkins* v. *Liberty Mut. Ins. Co.*, 434 Mass. at 567. "Even excessive demands on the part of a claimant . . . do not relieve an insurer of its statutory duty to extend a prompt and equitable offer of settlement once liability and damages are reasonably clear." *Bobick* v. *United States Fid. & Guar. Co.*, 439 Mass. at 662.

---

[8]In particular, the judge acknowledged that the plaintiffs suffered "the emotional distress arising from the frustrations of litigation, the substantial costs of litigation, even in a contingent fee case, and the fear of financial ruin," but found that these problems "arose from the fact that the minimum settlement they were prepared to accept was well above the settlement that the defendants were prepared to offer or were required by Chapter 176D to offer."

Our courts have recognized the frustrations and costs of unnecessary litigation as part of the injury to be averted by c. 176D and c. 93A, for those with meritorious claims covered by insurance policies. See *Clegg* v. *Butler*, 424 Mass. at 419. To further that objective, the statutes are "designed to make it 'unprofitable' for a defendant to ignore meritorious claims." *International Fid. Ins. Co.* v. *Wilson*, 387 Mass. 841, 857 (1983) (c. 93A). Therefore, even where the plaintiff initially rejected a tardy but reasonable offer of settlement, the Supreme Judicial Court has reiterated that "quantifying the damages for the injury incurred by the plaintiff as a result of [an insurer's] failure under G. L. c. 176D, § 3(9)(*f*), does not turn on whether the plaintiff can show that she would have taken advantage of an earlier settlement opportunity." *Hopkins* v. *Liberty Mut. Ins. Co.*, 434 Mass. at 567. See *Bobick* v. *United States Fid. & Guar. Co.*, 439 Mass. at 663, and cases cited (reiterating the teaching of *Hopkins, supra*).

We believe the Supreme Judicial Court's discussion of the issue in *Bobick, supra* at 662-663, should guide our analysis in this case, despite AIGDC's assertion that it constituted mere dicta.[9] To begin, we agree with the plaintiffs that evidence that they would not have settled their claims for less than $8 million at mediation, less than a month before trial, was speculative as proof of whether they would have settled their claims had AIGDC put forth a reasonable offer months earlier, and should not serve as the basis for denying recovery for the insurer's misconduct. Indeed, the judge's finding that the unlawful delay in making a settlement offer was strategic on AIGDC's part implicitly acknowledged that, at least from AIGDC's jaded perspective, the degree of the claimants' frustrations was subject to change as the case dragged on. AIGDC apparently was willing to risk a deliberate violation of the statutes in the hope that the plaintiffs' mounting frustrations and financial strain would inure to the insurer's benefit. The statutory multiplier serves as a deterrent to just that. See, e.g., *Yeagle* v. *Aetna Cas. & Sur. Co.*, 42 Mass. App. Ct. 650, 655 (1997) ("Hence the 1989 amendment

---

[9]In *Bobick*, the Supreme Judicial Court affirmed summary judgment for an insurer on a c. 93A claim where the insurer's timely offer of $50,000, rejected by the plaintiff, was some $10,000 less than "the principal amount assessed by the jury" against the insurer in the subsequent trial on the tort action. 439 Mass. at 662.

[to c. 93A], which threatened a bad faith defendant with multiplication of the amount of the judgment secured by the plaintiff on his basic claim — a total that might be many times over the interest factor").

Recognizing the damaging effects of such tactics by insurers, the Supreme Judicial Court said in *Hopkins* v. *Liberty Mut. Ins. Co.*, *supra*:

> "We reject the defendant's contention that the plaintiff has not shown she was adversely affected or injured by its conduct. The defendant's deliberate failure to take steps, as required by law, to effectuate a prompt and fair settlement . . . when the liability of its insureds was clear, forced the plaintiff to institute litigation, and in so doing, to incur the inevitable 'costs and frustrations that are encountered when litigation must be instituted and no settlement is reached.' "

434 Mass. at 567, quoting from *Clegg* v. *Butler*, 424 Mass. at 419.[10]

Given the uncertainty of the effect that unfair settlement practices and prolonged pretrial maneuvering may have on the claimant's circumstances and outlook when a late settlement offer finally is made, we think the plaintiffs' recovery here should not turn on conjecture as to what they might have done had AIGDC not abused its position. AIGDC may have gambled that delaying until trial was imminent would weaken the claimants' resolve; the opposite may well occur.[11] Even AIGDC's posture changed considerably once the trial was underway, increasing

---

[10]In *Hopkins*, the underlying negligence action settled before trial. The Supreme Judicial Court affirmed a c. 93A damages award against the insurer, with both the base damages and the multiplication of damages based on the interest on the settlement ultimately agreed to in the underlying negligence action. The court concluded that, even though the settlement amount was the same as an amount earlier offered and initially rejected, the plaintiff had been harmed because of the tardiness of the offer, and thus started the clock running on the c. 93A damages award from thirty days after the plaintiff's c. 93A demand letter was received. 434 Mass. at 560-561, 566-568.

[11]Indeed, in finding that AIGDC's stated reasons to depose Marcia and Rebecca before making a settlement offer at mediation were a pretense, the judge, too, referred to the possibility that attitudes toward settlement were subject to change: "[T]he reason to depose them was simply to gauge how credible they would be at trial, and this reason was offset by the fear that

its offer from $3.5 million to $6 million in a matter of days. But whatever the effect of AIGDC's calculated delay on the plaintiffs' willingness to accept the tardy offer eventually put forth, we hesitate to hinge their recovery on a hypothetical response to a timely and reasonable offer, based on their actual response to a deliberately late one.

Our analysis is informed by the purpose of the statutory scheme, which is not to require the insurer to extend an initial offer that must be accepted by the claimant but, rather, to initiate the process of settlement negotiations promptly and thereby facilitate out-of-court resolution. "The statute [G. L. c. 176D, § 3(9)] does not call for [a] defendant's final offer, but only one within the scope of reasonableness." *Bobick* v. *United States Fid. & Guar. Co.*, 439 Mass. at 662. See *International Fid. Ins. Co.* v. *Wilson*, 387 Mass. at 857 (c. 93A). By initiating the settlement process in a timely fashion, the ordinary give and take of negotiations provides the opportunity to move forward toward resolution before costs escalate, frustrations mount, positions harden, and a trial looms. "Ordinary give and take would suggest that both would and should move." *Forcucci* v. *United States Fid. & Guar. Co.*, 11 F.3d 1, 2 (1st Cir. 1993) (describing the settlement process under c. 176D, § 3[9]). The applicable statutes were enacted to prevent the harmful effect on the claimant and the settlement process when the claimant's demand for settlement of a meritorious claim goes unanswered. See, e.g., *Clegg* v. *Butler*, 424 Mass. at 419 ("Whether a settlement is eventually reached or not, unjust delay subjects the claimant to many of the costs and frustrations that are encountered when litigation must be instituted and no settlement is reached").

We conclude that the causal link between AIGDC's unfair settlement practices and injury to the plaintiffs was sufficiently established by showing that the insurer failed to initiate the settlement process once the merits of the plaintiffs' claims were clear, thus depriving the plaintiffs of the opportunity to engage in a timely settlement process, and thereby forcing them to pursue recovery through the courts. See *Hopkins* v. *Liberty Mut. Ins. Co.*, 434 Mass. at 566-567. Compare *R.W. Granger & Sons,*

deposing them would harden the plaintiffs' already tough position as to settlement."

*Inc.* v. *J & S Insulation, Inc.*, 435 Mass. 66, 81 (2001) (unreasonable settlement practices after jury verdict on underlying claim).[12] "In this context, 'injury' simply refers to 'the invasion of any legally protected interest of another.' " *Clegg* v. *Butler*, 424 Mass. at 418, quoting from *Leardi* v. *Brown*, 394 Mass. 151, 159 (1985), and Restatement (Second) of Torts § 7 (1965). See generally *Hershenow* v. *Enterprise Rent-A-Car Co. of Boston*, 445 Mass. 790, 799-800 (2006) (discussing *Leardi, supra*). The record here established that the plaintiffs were injured when the settlement process was inexplicably delayed, thereby compounding their frustrations and fears as a result of prolonged and deliberate neglect of their meritorious claims. See *Hopkins* v. *Liberty Mut. Ins. Co.*, 434 Mass. at 567. Compare *R.W. Granger & Sons, Inc.* v. *J & S Insulation, Inc.*, 435 Mass. at 81 (causal link established between insurer's wrongful postverdict settlement practices and loss to plaintiff when plaintiff's clear right to recovery under its surety bond was delayed).

We consider the statutory purpose better served if evidence that the plaintiffs rejected AIGDC's $3.5 million offer less than a month before trial, or even hoped for significantly more at that late date, is not relied upon to suppose that the settlement process was doomed from the start. The Legislature has placed the duty on the insurer to effectuate settlements by proceeding promptly with a reasonable settlement offer, thereby reducing the uncertainties and frustrations that inevitably follow from needless delay and the complications of litigation. "An insurer should not be permitted to benefit from its own bad faith, where,

---

[12]In recognizing the harm caused by the insurer's unfair settlement practices in this situation, we do not rely upon a per se injury as referenced in *Hershenow* v. *Enterprise Rent-A-Car Co. of Boston*, 445 Mass. 790, 798-799 (2006), a c. 93A case that neither involved nor addressed the obligations of insurers under c. 176D. Rather, we point to the Supreme Judicial Court's observation that in the insurance context, and to a tort victim with a meritorious claim for coverage, the frustrations of being ignored by the insurer and being forced into unnecessary court action to secure the claimant's statutory right to a reasonable settlement constitute an injury. *Hopkins* v. *Liberty Mut. Ins. Co.*, 434 Mass. at 567. See *Metropolitan Property & Cas. Ins. Co.* v. *Choukas*, 47 Mass. App. Ct. 196, 200 (1999) ("Choukas was adversely affected and injured by Metropolitan's failure to make an offer, as he had to go through the arbitration proceedings and all the subsequent court actions"), overruled on other grounds by *Murphy* v. *National Union Fire Ins. Co.*, 438 Mass. 529, 533 n.7 (2003).

as occurred here, it violated G. L. c. 176D, § 3 (9)(*f*), by intentionally failing to make a prompt, fair offer of settlement." *Hopkins* v. *Liberty Mut. Ins. Co.*, 434 Mass. at 568. On this record, we conclude that the plaintiffs established that they were harmed when AIGDC deliberately chose to ignore its statutory duty to make a prompt settlement offer when liability was clear, thereby denying the plaintiffs the opportunity to engage in the settlement process and exacerbating their losses.

b. *Measure of damages.* While our reading of *Hopkins* v. *Liberty Mut. Ins. Co.* and *Bobick* v. *United States Fid. & Guar. Co.*, *supra*, persuades us that the plaintiffs' rejection of AIGDC's offer of $3.5 million at mediation did not undermine the causal link between the insurer's delay and the plaintiffs' damages, it did, however, affect the measure of those damages.

In *Hopkins* v. *Liberty Mut. Ins. Co.*, *supra*, where the plaintiff accepted a late settlement offer, the Supreme Judicial Court explained the measure of damages as follows: "The so-called causation factor entitles a plaintiff, like the plaintiff here, to recover interest on the loss of use of money that should have been, but was not, offered in accordance with G. L. c. 176D, § 3(9)(*f*), if that sum is in fact included in the sum finally paid to the plaintiff by the insurer." 434 Mass. at 567. The court then added by footnote: "We need not decide in this case whether the same measure of damages would apply in a case where an insurer, having initially violated G. L. c. 176D, § 3 (9)(*f*), and G. L. c. 93A, §§ 2 and 9, thereafter makes a fair and reasonable (but nevertheless tardy) offer of settlement, which is refused by a claimant." *Id.* at 567 n.16. We read the qualification to mean that while the court did not reach the question whether the "measure of damages," that is, how the damages are quantified, would differ when a reasonable offer is made late and rejected, damages are nevertheless incurred in such a situation as a consequence of the insurer's delay. See, e.g., *R.W. Granger & Sons, Inc.* v. *J & S Insulation, Inc.*, 435 Mass. at 81-82 (discussing "measure of damages," as distinct from issue of causation, as going to question whether single or multiple damages should be awarded and amount to be multiplied). Contrary to AIGDC's assertion, we do not read the *Hopkins* footnote to mean that the recalcitrant insurer that eventually makes an offer prior to trial might be relieved of

all damages; that would tend to condone, rather than discourage, strategic delay. See *Hopkins* v. *Liberty Mut. Ins. Co.*, *supra* at 566 (c. 176D, § 3[9][f], and c. 93A, § 9, "together require an insurer . . . promptly to put a fair and reasonable offer on the table when liability and damages become clear, either within the thirty-day period set forth in G. L. c. 93A, § 9[3], or as soon thereafter as liability and damages make themselves apparent"). Compare *R.W. Granger & Sons, Inc.* v. *J & S Insulation, Inc.*, *supra* at 77 (c. 176D was intended to punish insurer that deliberately delayed offer to settle after jury verdict in underlying action, only to put forth late offer that was substantially less than case was worth).

The statutory scheme still encourages the insurer to put the offer on the table, even if late in doing so, to avoid multiplication of the underlying judgment. "That a wilful violator can limit his liability by making a reasonable settlement offer demonstrates the critical importance of the settlement process." *International Fid. Ins. Co.* v. *Wilson*, 387 Mass. at 857. In keeping with the statute's purpose of fostering out-of-court resolution of insurance claims, we conclude that the amount of the damages for AIGDC's tardy but reasonable offer, rejected by the plaintiffs, should not be measured by the judgment obtained in the underlying tort action, as urged by the plaintiffs but, rather, should be measured by loss of use principles. As such, damages should be calculated between the time AIGDC breached its duty to make the initial offer, and the date the reasonable offer finally was made and rejected; this is the same result to the insurer had its late but reasonable offer been accepted. See *Hopkins* v. *Liberty Mut. Ins. Co.*, 434 Mass. at 567 (claimant entitled to recover "interest on the loss of use of money that should have been, but was not, offered," to remedy insurer's wrongdoing).[13] Compare *Yeagle* v. *Aetna Cas. & Sur. Co.*, 42 Mass. App. Ct. at 654-655

---

[13]We therefore avoid an outcome anticipated by the trial judge, who expressed the concern that, "if this Court, under *Hopkins*, were required to find that the plaintiffs suffered even nominal damages from being denied a prompt settlement offer that they certainly would have rejected, and if this Court were to find the violation willful or knowing (which it does), the plaintiffs would be entitled to receive not merely those nominal damages . . . but also double or triple the amount of the judgment they received in the underlying personal injury case — that is, $22.6 million or $33.9 million."

(where case went to trial after failed negotiations in which insurer offered less than competent conciliator's evaluation of case value, and plaintiff would have accepted the amount determined by the conciliator, proper measure of c. 93A single damages award was interest on tort recovery for period settlement was wrongfully withheld).

We must therefore remand the matter to the Superior Court for a determination of loss of use damages on the amount of AIGDC's $3.5 million settlement offer, between the date the judge found AIGDC clearly violated the statute, May 1, 2004, and the date it finally made a reasonable offer, August 11, 2004. Because AIGDC's delay was found to be wilful and knowing, the amount of the plaintiffs' damages is subject to multiplication. See *Hopkins* v. *Liberty Mut. Ins. Co.*, 434 Mass. at 561, 569. Whether the damages are to be doubled or trebled shall be decided on remand as well.

2. *AIGDC's postverdict conduct.* The judge also found that AIGDC violated the applicable statutes by deliberately failing to make a prompt and reasonable settlement offer to the plaintiffs following the jury verdict in the underlying action. The judge characterized AIGDC's initial postverdict offer of $7 million, on December 17, 2004, as "not only unreasonable, but insulting," and found it a knowing and wilful violation of c. 176D. The judge awarded loss of use damages to the plaintiffs, which he doubled rather than trebled, "only because AIGDC later came to its senses and made a reasonable post-judgment offer before the appellate litigation began in earnest."

a. *Liability.* AIGDC filed a cross appeal from the judge's determination that AIGDC violated its statutory duty by unreasonably delaying settlement with the plaintiffs after the verdict in the underlying case. In particular, AIGDC argues that the judge erred in finding that its appeal from the judgment in the tort action lacked merit, without first hearing expert testimony addressing the issue. But where AIGDC conceded liability at the outset of the underlying trial on the tort action, we reject AIGDC's argument that the issues raised in its appeal from that judgment were so complex or involved such specialized knowledge that the judge required expert opinion as to their merits. The grounds for the appeal, which the judge assessed as "unusually feeble,"

involved the amount of the judgment, which AIGDC's own experts placed as within the reasonable range for the plaintiffs' claims, and a single evidentiary ruling made during discovery that denied AIGDC access to Marcia's psychological records. The cases relied upon by AIGDC do not establish that the judge required expert testimony regarding insurance industry practice in order to determine that those grounds for appeal lacked merit and that AIGDC's postjudgment settlement conduct violated the statutes.

b. *Damages.* The judge awarded the plaintiffs loss of use damages on the $8.965 million settlement ultimately agreed to, at the rate of one percent per month, for five months (see note 14, *infra*).

The plaintiffs argue that the underlying tort judgment should serve as the amount to be multiplied for AIGDC's wilful and knowing delay in making a reasonable settlement offer postverdict and for its pursuit of what the judge found to be a meritless appeal. It is true that the 1989 amendment to c. 93A provided that the underlying tort judgment, rather than loss of use damages, was to be multiplied when the "insurer had acted in bad faith . . . and the plaintiff had been obliged to try to the end an action on the underlying claim." *Yeagle* v. *Aetna Cas. & Sur. Co.*, 42 Mass. App. Ct. at 655. Here, however, where a settlement was reached postverdict, and litigation at the appellate level had not commenced to a significant degree at that time, we conclude that the statutory purpose was served by measuring punitive damages according to loss of use rather than the underlying tort judgment. Compare *R.W. Granger & Sons, Inc.* v. *J & S Insulation, Inc.*, 435 Mass. at 77, 82 (punitive damages double the amount of the underlying judgment properly awarded for wilful and knowing violation of c. 93A where judge found surety's inexplicable delay in settling after verdict against its principal in underlying action forced additional litigation on bond for nearly a year and necessitated a hearing at which surety put forth no viable defense).

Ordinarily when there has been a settlement before trial, damages for the time lost by the insurer's tardiness are calculated according to the interest lost on the money wrongfully withheld. See *Clegg* v. *Butler*, 424 Mass. at 425 ("As part of a statutory scheme meant to encourage out-of-court resolutions, [c. 93A]

does not punish settling insurers by placing the entire settlement award at risk of multiplication"); *Hopkins* v. *Liberty Mut. Ins. Co.*, 434 Mass. at 567 (in case where settlement occurred before trial, award was for interest for loss of use on amount that should have been offered earlier). We concur with the judge that the same should be true in the procedural posture of this case, where, despite AIGDC's ongoing, inexcusable, and deliberate misconduct, it made a reasonable settlement offer before trial, which was rejected, and the parties eventually settled postverdict. The judge, therefore, properly multiplied the loss of use damages for AIGDC's wilful and knowing violation in delaying the offer of a reasonable settlement after the verdict in the underlying tort action.[14] Compare *id.* at 560-561, 569.

3. *Zurich's pretrial conduct.* The judge found that, as to Zurich, the existence of damages exceeding Zurich's $2 million policy limits became reasonably clear in October, 2003, and that remaining questions concerning the availability of other coverage were resolved by mid-November, 2003. The judge further found

---

[14]The judge awarded loss of use damages for the postverdict violation at the statutory rate of one percent per month, for a period of five months, based on his finding that if AIGDC had made a reasonable offer on December 17, 2004, instead of the unreasonably low offer it actually made, then settlement would have occurred in January, 2005, instead of June, 2005, and the first of the three installment payments would have been paid in February, 2005, rather than, as actually occurred, in July, 2005.

Both parties appeal from this determination. The plaintiffs argue that the judge should have calculated loss of use damages for the postverdict violation from either the date of the underlying tort judgment (September 28, 2004), or December 17, 2004 (the date of AIGDC's response to the plaintiffs' c. 93A letter). In its cross appeal, AIGDC argues that the plaintiffs agreed to forgo statutory postjudgment interest as part of their settlement of the underlying tort action and that, in any event, the only evidence at trial regarding the measure of loss of use damages was the testimony of Harold that he would have invested the settlement funds, if paid earlier, in low-risk bonds, paying interest at the time of trial at three and one-half percent.

AIGDC has not persuaded us that the plaintiffs' reservation of right to pursue their claims against AIGDC for violations of c. 93A and c. 176D excluded the right to recover damages for those violations. Nor does AIGDC provide authority requiring that we overturn the judge's decision, as fact finder, to utilize the statutory rate for postjudgment interest as the measure of the plaintiffs' damages for late settlement. Neither have the plaintiffs demonstrated that the judge erred in awarding damages based on the date he found a settlement would have been reached if a reasonable offer had been made on December 17, 2004.

that the steps taken by Zurich after November, 2003, to obtain authorization within the company to tender its policy limits were reasonable. Accordingly, the judge ruled that Zurich's tender of its full policy on January 23, 2004, was timely, as required under c. 176D, § 3(9)(f).

The plaintiffs challenge the judge's finding that the existence of damages exceeding Zurich's $2 million limit did not become reasonably clear until October, 2003, and that Zurich's liability and damages did not become reasonably clear until November 19, 2003. The judge's determination of the reasonableness of Zurich's conduct was a question of fact, see *Clegg* v. *Butler*, 424 Mass. at 422, and therefore will not be disturbed unless clearly erroneous. The evidence supported the judge's finding that information concerning Marcia's medical expenses was not reasonably clear to Zurich until the fall of 2003. The judge relied on the fact that the plaintiffs did not provide Zurich with Marcia's medical records and an accurate record of her medical expenses until the August 13, 2003, demand letter. The evidence supported the judge's finding that Zurich acted reasonably and in conformity with industry standards in then verifying the damages, conferring with the other defendants regarding the availability of coverage and responsibility for the defense, and hiring its own life care expert to estimate the cost of Marcia's future care.

The plaintiffs also complain that Zurich's delay between November, 2003, and the January, 2004, tender violated the statutory requirement of a prompt settlement offer once liability and damages are clear to the insurer. In contrast to AIGDC's delay, however, the judge found Zurich's treatment of the claim reasonable, given the amount of the offer, the hierarchy for approval, and the lack of availability of key personnel at Zurich during that period. The plaintiffs do not challenge as clearly erroneous the judge's subsidiary findings regarding Zurich's actions between November, 2003, and January, 2004, and we conclude that his findings provided adequate support for ruling in Zurich's favor. See, e.g., *Buster* v. *George W. Moore, Inc.*, 438 Mass. 635, 642-643 (2003) (burden of proof rests on appellant to show error, where judge's findings are supported by any reasonable view of evidence).

*Conclusion.* Paragraph two of the judgment shall be modified to provide that AIGDC's and National Union's violation of G. L. c. 176D, § 3(9)(*f*), prior to issuance of the final judgment in the underlying case, was wilful and knowing, and caused the plaintiffs to suffer actual damages from May 1, 2004, to August 11, 2004, as measured by the loss of use of $3.5 million during that period. The matter is remanded to the Superior Court for determination of the multiplication of the damages award in paragraph two of the modified judgment; that is, the damages shall either be doubled or tripled. Paragraph six of the judgment shall thereupon be modified accordingly. In all other respects, the judgment is affirmed.

*So ordered.*

BERRY, J. (concurring in part and dissenting in part). With due respect, I dissent from part 1.b. of the majority opinion, concerning the measure of damages for the pretrial conduct of AIG Domestic Claims, Inc. (AIGDC).[1] I dissent because I do not believe that the AIGDC[2] August 11, 2004, settlement offer was fair and reasonable, or that the low-end offer advanced by AIGDC ended the G. L. c. 176D, § 3(9)(*f*), violation.[3] Instead, I conclude that (1) by not engaging in good faith pretrial settlement

---

[1]Apart from this dissent to part 1.b., I concur with the majority opinion.

[2]See note 5, *ante.*

[3]Respectfully, I disagree with the majority's passing comment in note 7, *ante,* that, in this appeal, the plaintiffs have not challenged the judge's finding concerning the $3.5 million. To the contrary, the heart of the plaintiffs' appeal is predicated on a challenge to the trial judge's decision to limit the plaintiffs' damages because the judge concluded that the figure of $3.5 million, albeit advanced late, was fair and reasonable and, therefore, ended AIGDC's pretrial violation of c. 176D, notwithstanding the fact that the judge found AIGDC's violation was "willful and knowing." Accordingly, it is clear that the essential challenge in the plaintiffs' appeal encompasses both the timing and the amount of AIGDC's last-minute, low-ball offer — appellate issues that are inextricably intertwined. Thus, I see little question but that the interrelated issue of the fairness and reasonableness of the AIGDC $3.5 million settlement amount, and the issue of the fairness and reasonableness of the pretrial time line involving AIGDC's deliberate strategy to delay mediation and the proffering of any offer until just before trial are both encompassed in the plaintiffs' appeal and need be addressed by this court. Indeed, were both issues — the timing and the amount of the AIGDC offer — not before us, a large measure of the majority opinion would not need to have been written.

negotiations, AIGDC in effect forced the plaintiffs to go to trial; (2) AIGDC, therefore, remained open to damages for its G. L. c. 176D, § 3(9)(f), violation; and (3) AIGDC was vulnerable to potential unfair insurance practice damages, extending up to the full amount of the jury verdict — not loss of use damages, as limited and capped by the majority opinion.

1. *AIGDC settlement offer not fair and reasonable*. The information known to and the records possessed by AIGDC, as well as case value assessments prepared by the lead insurers and their agents and held within the AIGDC files, reflect a pretrial assessment of a high of $10 million as the quantum of damages for the plaintiffs' injuries, with the lowest damage assessment being $5 million. Against this backdrop, the AIGDC $1.5 million offer under its policy, late-advanced on August 11, 2004, cannot be deemed fair and reasonable. Further, despite indisputable liability, AIGDC remained silent, advancing absolutely no settlement offer, except the low-end settlement offer advanced on the eve of trial.

It is, in my view, important in assessing the G. L. c. 176D, § 3(9)(f), violation damages, that it was AIGDC, the insurer with the largest coverage, which held out from engaging in settlement negotiations, rendering pretrial settlement more difficult and unlikely. That is, notwithstanding that Zurich American Insurance Company (Zurich), the primary insurance carrier, tendered $2 million (the full amount of the Zurich policy), AIGDC held back until trial was imminent before advancing any settlement offer under the AIGDC $50 million excess insurance coverage.

Then, having violated G. L. c. 176D, § 3(9)(f), by refusing to participate in good faith pretrial settlement negotiations, AIGDC emerged from the shadows only to put forth this $1.5 million low-ball insurance contribution to the global settlement. Such a de minimis offer on the AIGDC $50 million excess insurance policy flies in the face of all the damage estimates and settlement recommendations to AIGDC summarized below in this dissent.[4] With the low-end AIGDC contribution of $1.5

---

[4]As does the majority, I too reject the AIGDC argument that, by not accepting the $3.5 million settlement figure, the plaintiffs were divested of the right to damages under G. L. c. 176D, § 3(9)(f). The plaintiffs' rejection of the offer did not erase the AIGDC unfair settlement practice in refusing to tender a

million,[5] the total pretrial settlement offer was only $3.5 million. Indeed, after this low-ball AIGDC August 11 offer, and the plaintiffs' rejection thereof, the plaintiffs, just under a month later, were compelled to commence trial of their case, on September 7, 2004. During that trial, AIGDC increased its component of the global settlement pool from $1.5 million to $4 million, thereby increasing the global offer to $6 million. However, even this was too low, when one considers that the judge found the AIGDC postverdict offer of $7 million to be "unreasonable" and "insulting."

2. *Judicial review in rejected settlement cases.* In affirming the implicit determination that the August 11 AIGDC offer of $1.5 million ended the G. L. c. 176, § 3(9)(*f*), pretrial violation, the majority approach, I believe, obscures the fundamental differences between *accepted* versus *rejected* pretrial settlement offer cases. This conflation yields *the same result in cases where a late settlement offer is rejected, as in cases where a late settlement offer is accepted.* However, this is contrary to the express reservation of the issue by the Supreme Judicial Court in *Hopkins* v. *Liberty Mut. Ins. Co.*, 434 Mass. 556 (2001). In that case, where a tardy offer was accepted by the plaintiff before trial, the court affirmed a damages award based on the agreed-to settlement offer, but declined to "decide in this [*Hopkins*] case whether the same *measure of damages* would apply in a case where an insurer, having initially violated G. L. c. 176D, § 3(9)(*f*), and G. L. c. 93A, §§ 2 and 9, thereafter makes a fair and reasonable (but nevertheless tardy) offer of settlement, which is refused by a claimant" (emphasis supplied). *Id.* at 567 n.16.

Where a settlement offer is accepted, as in *Hopkins*, a methodology for damage assessment based on the accepted pretrial settlement figure as the damage marker/calculator makes

---

more timely and prompt offer, which remained a violation of G. L. c. 176D, § 3(9)(*f*). Thus, there were still damages caused to the plaintiffs and an entitlement to recovery, as recognized in *Hopkins* v. *Liberty Mut. Ins. Co.*, 434 Mass. 556, 567 (2001), under the "causation factor."

[5] AIGDC's internal authorization for settlement was $3.75 million, of which $1.75 million would be contributed by AIGDC. Thus, the offer extended by AIGDC to the plaintiffs was $250,000 less than the authorized amount — a further reflection of AIGDC's not acting in good faith and low-balling the damages.

sense because acceptance of the offer, in and of itself, indicates that, although the insurer advanced the offer late, in violation of G. L. c. 176D, § 3(9)(*f*), the settlement offer was deemed fair and reasonable by the plaintiff — even if not perfect. In contrast, in a case of a rejected late-tendered settlement offer, such as that in the present case, no such fairness and reasonableness can be presumed, and the rejected offer should not be the per se marker/calculator for the G. L. c. 176D, § 3(9)(*f*), damage analysis. In other words, the *Hopkins* methodology — which depends on the accepted settlement figure and calculates the loss of use of monies based on that figure, measured during the period within which no settlement offer was forthcoming — does not work in rejected settlement offer cases. As the Supreme Judicial Court's reservation in *Hopkins* indicates, a difference in methodology to assess damages in a rejected offer case is important because, as further discussed below, if the rejected late pretrial settlement figure is given too much weight, that rejected figure, in effect, becomes a cap on damages for the G. L. c. 176D, § 3(9)(*f*), violation. That should not be so because, among other reasons, in a low-end rejected settlement case, a plaintiff is left with no real basis to consider resolution of claims by a pretrial settlement, and is virtually compelled to bring the case to trial to seek redress on the claims — which is antagonistic to the protections that G. L. c. 176D, § 3(9)(*f*), was enacted to provide for insureds.

Furthermore, in a rejected settlement offer case, such as this one, AIGDC, as the insurer defending the G. L. c. 176D, § 3(9)(*f*), violation:

> "bore the burden of proving that [its] settlement offer was reasonable and made in good faith in light of the demand and attendant circumstances. *Kohl* v. *Silver Lake Motors, Inc.*, 369 Mass. 795, 799 (1976). This determination required proof that the defendant[] did not act deliberately to derail the settlement process. Otherwise stated, a wrongdoer 'ought not wear out the claimant by unduly delaying settlement,' *Miller* v. *Risk Mgmt. Foundation of Harvard Med. Insts., Inc.*, 36 Mass. App. Ct. 411, 418 (1994), when liability, including causation and damages, is clear or highly likely. *Guity* v. *Commerce Ins. Co.*, 36 Mass. App. Ct. 339, 343 (1994)."

*Parker* v. *D'Avolio*, 40 Mass. App. Ct. 394, 395-396 (1996) (c. 93A settlement offer). Here, in light of its actions, AIGDC did not, I conclude, meet this burden.

Where there is no damage marker by the figure in an accepted offer, and given the *Hopkins* reservation on this point, when an offer is rejected, such as in the present case, what then is the judicial review and methodology for determining whether an insurer has met its burden of proof, and what is the damage marker/calculator for the G. L. c. 176D, § 3(9)(*f*), violation? I conclude that judicial scrutiny of what is fair and reasonable in a rejected settlement offer case must — among a host of factors involving the insurer's conduct in not engaging in pretrial settlement negotiations — directly involve consideration of the insurer's valuation of the case, what damage assessment information was available to the insurer, and whether the effect of the insurer's actions in failing to advance any fair and reasonable settlement left the plaintiff with no real alternative except to litigate the matter — which is precisely what G. L. c. 176D, § 3(9)(*f*), was designed to protect against.

In this case, respectfully, I see two fundamental omissions in the judicial review that led to acceptance of the AIGDC offer as being fair and reasonable. First, the Superior Court judge's conclusion, accepted by the majority, that the $1.5 million advanced by AIGDC on August 11, 2004, was fair and reasonable does not give sufficient weight to the actual damage information in the AIGDC files. Indeed, while the Superior Court judge acknowledged that AIGDC's contribution of $1.5 million to the August 11 global settlement offer of $3.5 million was "at the low end of . . . reasonable," the judge nonetheless accepted that rejected "low end" figure. But that conclusion is not sustainable, when the following facts in this case record are weighed: (1) since close to the beginning of the case, AIGDC was aware that liability was clear and damages would be very high, and the $50 million dollar excess insurance policy would be invoked; (2) as of January 30, 2002, AIGDC was on notice that its third-party claims adjuster, Crawford & Company (Crawford), characterized the claim as involving "catastrophic" personal injury damages, and that the plaintiffs' claim would carry a high value; (3) as of April 8, 2002, Crawford informed AIGDC of its recommendation that the full amount of the Zurich primary

policy coverage be placed in reserve; (4) in September, 2002, AIGDC was provided an estimate of the potential value of the case as being between $5 million and $10 million; (5) on November 21, 2002, the driver admitted criminal guilt for the crash; (6) as of August, 13, 2003, counsel for the defendant National Union Fire Insurance Company of Pittsburgh, PA (National Union) (for which AIGDC administered the subject claim), was provided a "day in the life" videotape portraying the care Mrs. Rhodes would require as a paraplegic, summarized medical expenses of $413,977.68, future medical costs estimated at $2,027,078, and out-of-pocket expenses of $83,984.74; (7) on November 19, 2003, AIGDC was informed that authority would be sought for Zurich to tender the full amount of $2 million primary coverage; (8) on the same day, November 19, 2003, defense counsel for Building Materials Corp. of America (GAF; see note 4, *ante*), the insured covered by National Union, recommended a $5 million settlement, but the AIGDC claims director rejected that recommendation; and (9) on December 19, 2003, the Zurich claims director prepared the underlying documents necessary for Zurich to tender the primary $2 million in insurance, and that documentation valued the claim in excess of $10 million.[6,7]

A second omission in the judicial scrutiny of the AIGDC pretrial offer — an omission which adds to my conviction that the August 11, 2004, $1.5 million settlement offer late-advanced by AIGDC cannot be sustained as fair and reasonable — is that the low-end pretrial offer, and the unfair insurance practices of AIGDC in refusing to engage in settlement negotiations until the eve of trial, left no alternative but for the plaintiffs to proceed to trial. This contravenes the core statutory purpose of G. L. c. 176D, § 3(9)(f), to enforce the obligations of insurers to

---

[6]Against the backdrop of all this record evidence, the judge's acceptance of the $1.5 million offer as fair and reasonable deferred — too heavily I think — to the abstracted damage views proffered by an AIGDC expert.

[7]Albeit not controlling, because we are here reviewing the pretrial offer of AIGDC, it is, nonetheless, of interest in scrutinizing whether the August 11, 2004, pretrial settlement offer of $1.5 million was fair and reasonable, that AIGDC's new settlement offer on December 17, 2004, after the jury's September 15, 2004, verdict, which offer provided that AIGDC would contribute $5 million to increase the global settlement to $7 million, was characterized by the judge as "not only unreasonable, but insulting," and a wilful violation of G. L. c. 176D.

tender settlement of a case before the tort plaintiff has to take the case to trial. See *Clegg* v. *Butler*, 424 Mass. 413, 425 (1997).

Judicial review of a settlement offer in a case such as this one, in which the insurer engaged in egregiously unfair settlement practices, involves not just pure fact review and findings concerning the figure in the late settlement offer by the recalcitrant insurer. Rather, judicial review also implicates questions of law concerning the seriousness of, and the extent of, an insurer's violations of G. L. c. 176D, § 3(9)(*f*), in its actions and pretrial settlement proffers.[8] In other words, to be considered is the gravity of the unfair practices of the insurer in refusing to participate in good faith pretrial settlement negotiations.[9] Also to be considered in judicial review is whether, as in this case, late in the day, as the trial date approached, the insurer engaged in a pretrial zero sum game strategy by advancing an offer that

---

[8]Given these mixed questions of fact and law, in a case involving judicial review of a rejected pretrial settlement offer in respect to damages under G. L. c. 176D, § 3(9)(*f*), and G. L. c. 93A, I do not accept the majority's position that appellate review is limited to just the clearly erroneous standard, as the majority suggest (see note 7, *ante*). See, e.g., *R.W. Granger & Sons, Inc.* v. *J & S Insulation, Inc.*, 435 Mass. 66, 73 (2001), and cases cited ("A ruling that conduct violates G. L. c. 93A is a legal, not factual, determination"); *Bobick* v. *United States Fid. & Guar. Co.*, 439 Mass. 652, 661 (2003), quoting from *Peckham* v. *Continental Cas. Ins. Co.*, 895 F.2d 830, 837 (1st Cir. 1990) ("That [reasonableness] is *ordinarily* a fact question does not make it *invariably* a fact question" [emphasis in original]). But, in any event, even in considering appellate review under the "clearly erroneous" standard, see Mass.R.Civ.P. 52(a), as amended, 423 Mass. 1402 (1996), a finding may be reversed when, "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Basis Technology Corp.* v. *Amazon.com, Inc.*, 71 Mass. App. Ct. 29, 36 (2008), quoting from *Demoulas* v. *Demoulas Super Mkts., Inc.*, 424 Mass. 501, 509 (1997).

[9]Throughout the pretrial proceedings, AIGDC was recalcitrant in participating in settlement negotiations as required by law, this notwithstanding the tendering of offers by the primary insurer. Further, pretrial, ignoring its statutory obligations, AIGDC tendered only the bargain basement low-end offer of August 11. It was not until after the end of trial and the jury verdict, and after the judge had denied AIGDC's motion for new trial, and after receipt of the plaintiffs' c. 93A demand letter, that AIGDC finally moved to a fair and reasonable settlement posture. Even at this posttrial stage, pending appeal, AIGDC wilfully persisted in unfair settlement acts — among other things seeking to link any settlement offer with a waiver of the plaintiffs' claims under G. L. c. 176D and G. L. c. 93A — all of this, I submit, flowing in the aftermath of the original late low-ball offer.

sought to place the plaintiffs at a decision intersection with the only choices being (i) to yield by acceptance of a low-end, low-grade settlement, even though consistent neither with the plaintiffs' major injuries (as documented and evaluated by the involved insurance companies) nor with the indisputable liability under the subject policy; or (ii) to proceed to full litigation by trial of the case.

If G. L. c. 176D, § 3(9)(*f*) — which is designed to foster pretrial settlements in lieu of litigation by trial — means anything, it should mean that an insurer, such as AIGDC, cannot engage in such a zero sum pretrial game strategy by advancing a low-end offer which has no real nexus to the damage information and case evaluations possessed by the insurer. Such pretrial conduct by an insurer, in violation of G. L. c. 176D, § 3(9)(*f*), ineluctably will end in a plaintiff having to proceed to trial, as happened here. This part of AIGDC's egregious conduct, and the inherent legal conflict it poses with the statutory purposes of G. L. c. 176D, § 3(9)(*f*), was not, I respectfully submit, given due legal weight in the analysis that led to acceptance of the AIGDC $1.5 million as fair and reasonable.

Because I believe that the AIGDC August 11 late-advanced offer was not fair and reasonable, it did not end the AIGDC G. L. c. 176D, § 3(9)(*f*), pretrial violation. Thus, the cap and the time period limitations on the damages for unfair pretrial settlement practices under G. L. c. 176D, § 3(9)(*f*) (as applied in *Hopkins*, 434 Mass. at 567, and as accepted by the majority in this appeal), should not protect AIGDC in this case. Rather, in my judgment, AIGDC was left potentially open to unfair insurance practice damages that may range as high as the jury verdict, and which, given the wilful violation, will either be doubled or trebled, as provided in G. L. c. 93A, § 9(3).

3. *Conclusion.* Given the foregoing, I dissent from part 1.b., *ante*, and would rule that, as matter of law, AIGDC's last-minute $3.5 million pretrial settlement offer was not reasonable. I would therefore remand the matter to the Superior Court for a determination of damages for AIGDC's pretrial violation of G. L. c. 176D, § 3(9)(*f*), based on the jury verdict, and for a determination whether the damages for AIGDC's wilful violation shall be doubled or trebled.